PETER F. HUBER ET AL. *vs.* H. R. DOUGLAS, INCOR-
PORATED, ET AL.

Second Judicial District, Norwich, October Term, 1919.
PRENTICE, C. J., WHEELER, BEACH, GAGER and CASE, Js.

Although a building, as distinct from the soil, is not entitled at common
   law to lateral support from the adjoining land, the owner of the
   latter who demolishes and removes a building thereon is bound to
   use reasonable care in so doing not to injure the contiguous build-
   ing of another; and therefore is responsible in damages for negli-
   gence which directly results in the downfall of his neighbor's build-
   ing.

A direct accusation of responsibility for a disaster, followed by silence
   or acquiescence upon the part of the accused, is receivable in evi-
   dence for what it may be worth as tending to prove an admission
   of liability.

Whenever a party's attitude or course of conduct respecting the subject-
   matter of the litigation has been inspired by an assurance of his
   adversary, he may testify to such assurance in order to rebut any
   claim that such conduct was negligent or fatal to his present con-
   tention.

A building leased and occupied by the plaintiffs as a dry-goods store—
   known as the Cady building—which adjoined a building the de-
   fendants were demolishing and removing, called the Marsh build-
   ing, collapsed and fell into the excavation, and the plaintiffs sought
   to recover damages of the defendant Marsh and of his contractor
   for their alleged negligence in doing the work. *Held* that the al-
   legations of the first count in the complaint, upon which the verdict
   against the defendant contractor was based (the second and third
   counts having been virtually eliminated by the answers of the jury
   to certain interrogatories), were broad enough to permit the plain-
   tiffs to show how or in what manner the wall of the Marsh building
   was removed, and, by properly qualified experts, what might have
   been expected to result from putting that method into practice.

It is often difficult to trace the line of separation between that which is
   merely unnecessary description, and that which is essential, in
   pleading; but the parties may readily protect themselves against
   surprise resulting therefrom by a motion for a more specific state-
   ment.

It is not essential that the jury should be given a definition of "con-
   tributory negligence" in so many words, provided the instructions
   touching negligence, proximate cause, and the standard or degree

of care required of the plaintiff, fully serve the purpose of such a definition.

The appellant insisted that the trial court imposed too great a burden upon it, in the degree of care demanded of it in its treatment of the Cady building; that in using the word "protection," in certain references to the measure of the defendant's duty to the Cady property, the court not only relieved the plaintiffs from all responsibility for its care and safety during the entire progress of the work, but cast that responsibility upon the defendant contractor; and that the court should have informed the jury what conduct was required of each litigant in order to satisfy the rule of reasonable care. *Held* that the charge, taken as a whole, refuted these claims: that with respect to the basic law of lateral support the charge was compact and correct, and brought into clear relief the essential bearing of the issue of negligence; that the jury were under constant reminder from the court that the defendant's duty was only that of an ordinarily prudent man under like circumstances, who might pursue any method whatever in the removal of his building, provided only the method used be a reasonably careful one; and that it was quite within the exclusive province of the jury to say what was required of the defendant contractor to give its conduct the essential quality of reasonable care, and whether in its acts of commission and of omission its course filled the full measure of its duty to the plaintiffs, or left something more to be done, even to the extent of shoring up the exposed wall.'

In the present case the plaintiffs testified that after the Marsh building had been removed and about a week before the accident, the defendant contractor's attention was called to the weakened and dangerous condition of the Cady wall, and that he then definitely promised and agreed to assume responsibility for its safety. *Held* that if this was true, as the jury must have found by their verdict, it made but little difference what the situation or attitude of the parties was before that date, since the conclusion reached by the jury practically settled the whole case.

Under our practice it has long been the rule that a general verdict rendered upon several counts will stand if any one of them justifies it.

Inconsistencies in the answers of the jury to interrogatories will be construed by the context; and an answer which is plainly limited to certain counts in the complaint, will be so construed.

Argued October 21st—decided December 22d, 1919.

ACTION to recover damages for the loss resulting to the plaintiffs from the collapse and fall of the building occupied by them as a retail dry-goods store, which

was alleged to have been due to the negligence of the defendants in demolishing and removing a building upon the adjoining premises and in excavating thereon, brought to the Superior Court in New London County and tried to the jury before *Greene, J.;* verdict and judgment for the plaintiffs for $23,500 against the defendant H. R. Douglas, Incorporated, and in favor of the defendant Marsh, from which the defendant company appealed. *No error.*

The complaint named two defendants—Marsh, the owner of the building referred to as the "Marsh Building," and H. R. Douglas, Incorporated, a concern which, under contract with Marsh, demolished and removed his building. The first of three alternative counts alleges, in substance, that the plaintiffs, as dealers in dry-goods and similar merchandise, were for a long time the occupants of certain premises on State Street in New London, under a lease with the owner, Mary L. Cady, of Brookline, Massachusetts; that Marsh had for more than a year owned the adjoining premises on the east, when, about the 1st of May, 1916, Douglas, Incorporated, began the demolition and removal of the Marsh building. The brick buildings then standing on both properties had been there for more than seventy years, and were so built and maintained that for all that period "the westerly wall of said Marsh building and the easterly wall of said Cady building were adjacent and contiguous, the bricks on the face of the westerly wall of said Marsh building being laid up against and in contact with the bricks on the face of the easterly wall of said Cady building." The work of demolition continued until the Marsh building was entirely removed, the removal of its west wall being completed about June 1st, 1916. The removal of the wall was "negligently and carelessly" done, "without providing any suitable or proper pro-

tection for the support of" the Cady wall "by way of bracing or shoring the same with timbers, or in any other manner attempting to do any acts to prevent" its collapse. The Cady wall thereafter remained "without support or protection of any kind" until June 20th, 1916, when it collapsed, and caused the destruction of the entire Cady building. During this period that elapsed after the last of the Marsh wall was taken away and until the collapse of the Cady building, the east wall of the latter "was obviously in a weakened and dangerous condition," and having "become, to a large extent, dependent upon the support furnished by the Marsh building," the removal of the Marsh wall left the Cady wall "likely to collapse and fall unless some proper protection was given to it." Although all this was or should have been well known to the defendants, they not only allowed the Cady wall to remain in this unprotected condition, but "wrongfully, carelessly and negligently made excavations" on Marsh's property within five feet of the foundation of this Cady wall. The soil at that point was sandy "and of such a treacherous and unsafe character that excavations made in said soil within five or six feet of the place where said soil was sustaining the great weight and pressure of supporting said easterly wall of said Cady building, would easily cause . . . said soil to shift, slip and move into said excavations, thereby removing the support afforded by said soil to the foundation of said easterly wall of said Cady building." While the work was in progress the plaintiffs gave notice to Marsh's architect and agent, "who had the supervision of the work for Marsh," of the dangerous and weakened condition of the Cady wall, and gave notice to the same effect to H. R. Douglas, president of H. R. Douglas, Incorporated, who "agreed with the plaintiffs to perform whatever acts might be necessary

to properly protect and support said Cady building and to prevent said easterly wall from collapsing." Reasonable and proper care by Marsh for the protection of the Cady property, in planning the work upon his own, would have prevented the injuries to the plaintiffs, which were due to the method employed by the Douglas Company in carrying out the work pursuant to Marsh's instructions. The collapse of the building was "in consequence, and as a direct result of the injurious, wrongful . . . and negligent acts of the defendants, as hereinbefore recited," and the plaintiffs were damaged by the destruction of their property, the interruption of their business, and the loss of the unexpired part of their lease, to an amount of more than $30,000.

The second count rests a claim for the same damages upon the substantial allegations that the Cady building as originally constructed was made to depend largely upon the support afforded it by the building which later became the property of Marsh; that this construction was with the knowledge and acquiescence of the then owners of the supporting building, and that this use of the Marsh wall had thereafter continued openly and under a claim of right for more than seventy years until the wrongful removal of the Marsh wall caused the Cady building to collapse.

The third count alleges that when the Cady building was constructed, both properties were under one ownership, and that the lateral support which the so-called Marsh building was made to furnish the Cady building became and remained a right appurtenant to the latter building. Under this count the same damages were claimed from the collapse of the Cady building by the wrongful removal of the Marsh wall in violation of this right.

Issue was joined by the denial of the essential alle-

gations of each count, and the answer of Marsh also averred that the position of the other defendant was that of an independent contractor.

Upon a trial to the jury the plaintiffs claimed to have proved, in addition to or in support of the allegations of the complaint, these facts: When the Cady building was constructed, the common owner of that and the adjoining Marsh building remodelled the latter, and in the construction work of the former erected a 16-inch solid brick bonded wall extending along the full length of the Cady building, resting on a foundation wall of stones of such size and so laid that some of them extended under the full width of the wall. This wall, in its full width, extended up nine feet to the Cady building's second story, and above that, to the top of the easterly wall of the Cady building, it was eight inches thick. At the top of the sixteen-inch section of the wall, the sill of the Marsh building rested upon the easterly half of it; and there were inserted into it, from the foundation to the top of the sixteen-inch section, uprights which were a part of the Marsh building construction. From the second floor of the Cady building to the top, the studding of the Marsh building was in most places against the eight-inch wall of the Cady building, and four inches of brick and mortar had been placed between the studding, so as to be, for the most part, in contact with the eight-inch Cady wall. In removing this studding upon the demolition of the Marsh building, most of this brick and mortar adhered to the wall, "so that it had to be hammered and broken away, and removed by tools." All of it down to the Cady building's second floor was removed after the Marsh structure had been taken down, and this work of hammering and breaking away left the Cady wall in a roughened and dangerous condition, and weakened it by thus loosening the lime and mortar between the

bricks. The defendants took no precautions for the safety of the Cady building, "either by shoring up the easterly wall, or otherwise."

One H. R. Douglas was president and manager of the Douglas Company, was in charge of its work on the Marsh property, and had full power to bind the company in relation thereto. On June 14th, 1916, the plaintiff Huber, acting also for the owner of the Cady building, had an interview with Douglas concerning the protection of the Cady building, and Douglas, as manager, agreed that the company would look out for and protect the building.

After the removal of the Marsh structure, but before the hammering away of the brick and mortar referred to, the defendants made extensive excavations all over the Marsh property, so that the general level of their depth was below the level of the foundation stones referred to, and after permitting these excavations to remain for eighteen days in the sandy soil of the Marsh land, the defendants dug a trench two feet wide and two feet deep parallel with the wall and from three to five feet away from it. This was allowed to remain open two days during a heavy rain-fall, and its depth in some places was more than three feet below the level of the foundation wall referred to. When the building collapsed, the foundation stones supporting the sixteen-inch divisional wall moved easterly a distance of five feet into these excavations. The collapse of the Cady wall was caused by the removal of the lateral support of the soil on the Marsh property, which caused the soil under the divisional wall to move, causing the slide of the foundation stones into the excavations referred to. The manner in which the work of taking down the Marsh building and in removing the four inches of brick and mortar from its contact with the Cady wall, were unusual and dangerous, and

ordinary care was not exercised by the Douglas Company for the protection of the Cady building, while the plaintiffs were free from any negligence contributing to the collapse of the building. The divisional wall was so constructed that the dependence of that part of it on the Cady side of the line, upon the portion on the Marsh side, was apparent to ordinary observation. Neither the plaintiffs nor the nonresident owner of the Cady property were notified in advance that the Marsh building was to be removed, or that any excavations were to be made on the Marsh land, or that the division wall between the buildings was to be disturbed, and when the plaintiffs observed work in progress, the officers and agents of the Douglas Company were warned of the danger attending the work and the necessity of care and caution for the protection of the Cady building. Their attention was also called, during the work's progress, to the dangerous condition of the wall, and to the fact that the soil under the foundation of the Cady building was slipping into the excavations on the Marsh land.

The defendants claimed to have established upon the trial these facts among others: When the studding was taken down, upon the removal of the upper stories of the Marsh building, the brick and mortar between the studs came with it, and while some of it stuck to the Cady wall, it was easily removed without injury to the wall. Nothing in the appearance and construction of the Cady and Marsh buildings indicated that either was dependent upon the other for support. The construction of the Cady building was weak and defective in certain respects, and had become weakened by time in other respects, to wit: (1) the floor joists which collapsed were not anchored in the easterly wall —the effect of such anchoring being to hold the building together. (2) There was no bridging between the

floor joists,—the effect of bridging being to equalize
the burden of support between the joists.  (3) Many of
the easterly ends of the floor joists were rotted—the
effect being to cause them to slip out of their sockets
and give an outward pressure to the wall.  (4) The
plank or plate on the top of the Cady wall, and the
ends of rafters resting upon it, had rotted—the effect
being to throw an unequal pressure from the roof upon
the wall, and give the latter an outward pressure.
None of these defects were known by the defendants,
and could not have been discovered by ordinary in-
spection.  The excavations upon the Marsh property
in no way tended to weaken the soil or earth on the
Cady property, or cause it, in its natural state, to fall
or move, and the only excavation made by the de-
fendants deeper than the bottom of the foundation
wall, was a trench dug the day before the collapse of
the building.  The defendants did not assume to shore
and protect the Cady building, and the plaintiffs
neither shored nor made any attempt to shore it, and
did not speak to the defendants about so doing, until
June 14th, 1916.

Upon the trial of the cause the plaintiffs produced in
chief W. Frederick Chittenden as a witness, who, hav-
ing testified upon his direct examination that he saw
Mr. Douglas, the president of the Douglas Company,
at the scene of the disaster on the evening of its oc-
currence, was asked: "What did you say to him, and
he to you, about the accident?" The witness: "I met
Mr. Douglas there, and he came up to me very excited,
and he said 'My God, Mr. Chittenden, this is awful!'
And I said to him, 'Yes, Mr. Douglas, and you are to
blame for it all.  If you had trussed up our building
this would never have happened.'" The defendants'
motion to strike out this answer was upon the ground
that it "is a declaration on the part of this plaintiff

of his opinion. Now, it is claimed here as an admission. The witness himself said, 'You are to blame for it.'" The motion was denied, the court saying: "The claim of the plaintiffs is that it is an admission by conduct. If I say to a man, 'You are to blame for this,' and he says nothing, it is an admission, they say, because he says nothing. . . . I think it is admissible for what it is worth." An exception was noted for the defendants. In response to a further question the witness said: "I don't think he replied to it."

On the redirect examination of the same witness, who was one of the plaintiffs, the following occurred: "Q. Mr. Chittenden, why didn't you do anything to shore up or protect the inside of your building between June first, if that was the time, and the time of the accident, on the outside of the wall? A. Because Mr. Douglas assured us it was perfectly safe, or assured Mr. Huber it was perfectly safe." The defendants moved to strike out this answer, but the court denied the motion.

The plaintiffs produced in chief James Sweeney as a witness, who, upon his direct examination, was asked the following questions, and the following answers, discussion, and ruling were made, and the following exception taken: "Judge Waller (for plaintiffs): I will ask you, Mr. Sweeney, first what you mean when you say that the portion of this wall had been split? Will you state what you saw, and what you mean by use of the term split? A. In splitting a wall, you separate one part from another, which leaves a very ragged surface on that face that is left. Q. What was this surface as you saw it? Describe it. A. As I say, it was a very irregular, ragged surface, with mortar and brick projecting away from the face there. Q. Now, you have said that this splitting of the wall, in your opinion, would affect the stability of the wall. I ask you if you will state in what manner such splitting of

the wall would affect the stability? A. The constant hammering away is bound to loosen up the mortar and brick from the mortar, and consequently the entire cohesiveness of the whole mass, and thereby endangering the stability. Q. Was there anything about the appearance of that east wall of the Cady building at the time you made this observation that in your opinion made that a dangerous situation, so far as the wall was concerned? A. Decidedly. Q. Now, will you illustrate what it was? Major Hull: Wait a minute, please. I don't recall in the pleadings any statement of acts of this kind, or any such declaration of negligence. The Court: The suggestion is that leaving the wall with this rough condition, with the bricks and mortar loosened from each other, and thereby weakened, is not set up as a specification of negligence. . . . That is not alleged as an ultimate matter, but it does seem to me admissible in evidence under the allegations of negligent removal and of leaving the wall, as the result of negligent removal, in a dangerous condition. I think it is proper. Major Hull: It seemed to me it was attempting to prove allegations not set up in the pleadings. The Court: There are many details, which have to be proved to get at the results alleged. Major Hull: I would like an exception. Q. (The last question read). A. The entire face of the wall, as I say, was very ragged. The ends of the bricks sticking out, and mortar hanging on it, on both the entire walls, here and there, and apparently had been well shaken up in the process of splitting the walls."

The plaintiffs produced in chief Charles Morgan Williams as a witness, who, upon his direct examination, was asked the following questions: "Q. Now, coming back to the situation of this wall which I have described between the Marsh and Cady buildings, suppose, in taking down the Marsh building, that portion

of the Marsh structure which rested upon and was built into the wall was removed, and the brick were removed so as to leave only eight inches of brick standing, and that was carried down to the top of the first story, the brick remaining so as to leave only eight inches standing until you got down to the top of the first story, what would be the effect of that upon the strength of the wall? A. It would weaken it. Q. Now, assuming that, in the removal of this Marsh building, the wall was taken down to the top of the first story, so as to leave standing only eight inches of the brick wall, and supposing no shoring whatever was done . . .; what would you say as to whether or not that was the usual and proper course of procedure?" This was objected to by the defendants as calling upon the witness to state what the law, or rule, is with reference to the duties of adjoining landowners under the conditions outlined. Objection overruled. Exception. "A. It is not. Q. Why not? A. Because it would weaken the wall. The wall would be weakened so it would be an unsafe thing to do."

The following interrogatories in writing were submitted to the jury, and were returned by them with the accompanying answers:—

"Interrogatories for Jury.

"If you find a plaintiffs' verdict against the Douglas Co., 1. Is the Douglas Company liable under the first count because of negligence? Answer: Yes. 2. Is the Douglas Company liable on the second count? Answer: Yes. 3. Is the Douglas Company liable on the third count? Answer: Yes.

"If you find a plaintiffs' verdict against Mr. Marsh, 4. Is Marsh liable under the first count because the Douglas Company was negligent and was his servant, and not an independent contractor? Answer: No. 5. Is Marsh liable under the first count because, although the

Douglas Company was an independent contractor, the work was obviously dangerous? Answer: No. 6. Is Marsh liable under the second count? Answer: No. 7. Is Marsh liable under the third count? Answer: No.

"Additional Interrogatories for Jury.

"If you find a verdict for either defendant, 1. Under the first count, did the plaintiffs fail to prove that the Douglas Company's negligence was a proximate cause of the damage? Answer: No. 2. Or, did the plaintiffs fail to prove that they themselves were free from negligence which was a proximate cause of the damage? Answer: No. 3. Under the second and third counts, did the plaintiffs fail to prove that the Cady building had an easement of support by the Marsh wall? Answer: Yes. 4. Or, did the plaintiffs fail to prove that the removal of the Marsh wall caused the collapse of the Cady building? Answer: Yes.

"If you find a verdict for Marsh, 5. Under the first count, did Marsh prove his second defense that he was not responsible because he employed an independent contractor? Answer: Yes."

The jury returned a verdict in favor of the defendant Marsh, and for the plaintiffs to recover damages, assessed at $23,500, of the defendant H. R. Douglas, Incorporated. The court accepted both verdicts and rendered judgment upon them.

The appeal of the defendant H. R. Douglas, Incorporated, assigns error, (1) in rendering judgment on the verdicts because of the claimed contradictions in the answers to the written interrogatories; (2) in the rulings on evidence disclosed in the statement of the case; (3) in the charge to the jury; and (4) in the court's failure to charge the jury in the language of various requests.

The portions of the charge objected to are sufficiently referred to in the opinion.

*Hadlai A. Hull* and *Nathan Belcher*, for the appellant (defendant Douglas, Incorporated).

*Christopher L. Avery* and *Charles B. Waller*, with whom was *Arthur B. Calkins*, for the appellees (plaintiffs).

CASE, J. There are inconsistencies in the answers which the jury returned to the interrogatories submitted to them, but they are not serious enough to vitally affect the verdict. Under our practice it has long been the rule that a general verdict rendered upon several counts will stand if any one of them justifies it. *Hoag* v. *Hatch*, 23 Conn. 585, 589. The jury perhaps over-emphasized the Douglas Company's liability, in spreading it over all three counts and at the same time removing two of these from consideration by finding, in substance, that the plaintiffs had not established their essential allegations; but there is nothing in this which weakens the effect of their conclusion as applied to the first count. That still answers the test, and fully justifies the court in rendering judgment for the plaintiffs upon the verdict.

We are also satisfied that the jury's answer to one of the so-called "additional interrogatories," to the effect that the plaintiffs had failed to prove that the removal of the Marsh wall caused the collapse of the Cady building, was plainly limited to the second and third counts of the complaint, and that it in no sense removed from consideration any of the stated grounds of negligence on which the first count rests. The context permits no other construction.

We find no error in the rulings of the court upon the admission of testimony. The answer of the witness Chittenden to the exclamation of Douglas, was properly admitted, with the qualification suggested by the court's comment. While the witness' statement was

not directly evidential of its truth, it was proper for the jury to consider for determining what, if any, significance attached to the manner in which Douglas received it, and how far, if at all, his silence should be construed as acquiescence in what amounted to a direct charge of personal responsibility for the disaster. The ruling is clearly justified as one dealing with a claimed admission by conduct or silence.

The answer of the same witness on his redirect examination was admissible as giving his own reason for a course of conduct which, unexplained, might have invited adverse criticism of his attitude as a plaintiff. The parties have assumed that this ruling is before us for review, although no exception seems to have been taken by the defendants in the trial court.

The finding does not so inform us, but in the defendants' silence we may fairly assume that the witnesses Sweeney and Williams testified as properly qualified experts. The question asked of Sweeney was admissible. The specific allegations of negligence as made in the first count of the complaint were broad enough to permit the plaintiffs to show how the wall was removed, what method was adopted in its removal, and what might have been expected to result from putting that method into practice. The question in no way violated the familiar rule that only negligence of the specific kind alleged is open to proof.

The court's admission of the question asked of Williams was also correct. It neither called for a statement by the witness of the legal rights of the parties, as the defendants objected, nor is it open to the rather fine-spun criticism advanced on the brief of calling for an opinion based upon a standard of care sufficient to assure the Cady building immunity from any harm whatever under any and all conditions. The witness was properly asked, as one presumably qualified by

his occupation to answer, whether the method claimed to have been adopted in this case was a safe and proper one. This was of pertinent bearing upon the claim of negligence, and the answer of the witness indicates that he fully understood the question and its reasonable limitations.

The defendant complains that no adequate definition of the term "contributory negligence" was given to the jury for their guidance. This criticism is directed to a single portion of the charge where the term was used by the court with no accompanying explanation of its meaning. It ignores the context, and the constantly recurring and interwoven references to that and kindred topics throughout the charge. The court correctly defined both negligence and proximate cause, and after telling the jury that "to recover, the plaintiffs must prove by a fair preponderance of the evidence that the negligence of the defendants was the proximate cause of the plaintiffs' injuries, and that no negligence of the plaintiffs was a proximate cause thereof," told them, in substance, that it was quite possible in a given case to trace the proximate cause or causes to concurrent conduct of both the plaintiff and the defendant. They were warned again later in the charge that even if the defendants' negligence should be found a proximate cause of the collapse of the building, "the plaintiffs must still prove that no negligence of their own was a proximate cause thereof." These references, read in connection with the court's repeated and correct statements of the standard and degree of care which the plaintiffs must establish of their own conduct to relieve them of such negligence as would prevent a recovery, fully served the purpose of an explicit definition of contributory negligence, and a caution to the jury as to the effect of its presence upon the plaintiffs' case. *Conway* v. *Waterbury*, 84 Conn. 345, 80 Atl. 83.

It is made a ground of appeal that the court by its instructions to the jury permitted them to consider and give controlling importance to claimed acts of negligence of a character not specifically relied upon in the complaint. This is more precisely aimed at the court's instructions upon three definite elements which figured in the evidence: (1) the chipping and hammering of the Cady wall so as to loosen the brick and mortar; (2) the splitting of the wall as the Marsh building was taken down; (3) the failure of the defendant to seasonably notify the plaintiffs in advance that it was about to take down the building.

In dealing with the testimony of the witness Sweeney, we have already sustained the trial court's ruling which held the second of these elements to be within the purview of the complaint. That conclusion is equally applicable to the remaining elements. The negligence charged in the complaint is not alone that of leaving the wall of the Cady building weakened and unsupported, but is specifically directed to the way the removal of the Marsh wall was accomplished. It is charged not only that this work was "negligently and carelessly" done, but that the "manner" of the wall's removal and the "method" pursued by the defendant were improper, and largely because this method wholly lacked the taking of "reasonable precautions" by the defendant to safeguard the Cady property. These assignments of negligence left open for the plaintiffs a wide range of evidential detail to establish their truth. It is neither practicable, nor the purpose of any rule of procedure, to compel the inclusion of all such matters in the complaint as a part of its necessary allegations. All that is insisted on is that the plaintiff shall be restricted in his offer of proof to evidential facts within the range of the case which his complaint fairly discloses, and that the complaint shall be definite

enough to mark out these limitations with reasonable certainty. While "it is true that the line of separation between that which is merely unnecessary description and that which is essential in pleading, often becomes almost a lost boundary" (*Shepard* v. *New Haven & N. Co.*, 45 Conn. 54, 57), parties have the means of ample protection against surprise resulting therefrom in the motion for a more specific statement.

The authorities cited by the defendant to sustain its contention on this branch of the case are not in point. They rest, without exception, upon a distinct departure from the case laid out in the complaint, by an attempt to import into it as a controlling factor some new or additional ground of negligence clearly outside of any specification of the complaint. That is not true of the situation presented here, and we think the trial court properly recognized all these elements as fairly in the case.

The court committed no error in its several references to the interview claimed to have taken place between the plaintiff Huber and Douglas, and its instructions as to the limited effect to be given the statements of the latter in the event of their being found proven, were manifestly correct. No serious question seems to have been made upon the trial as to the actual responsible relation of Douglas either to the work or to the defendant company, although the court carefully left both matters for the jury's determination. After fully stating the bearing upon the case of the claimed promise, if made, the court cautioned the jury that at the most it could only be "relevant on the question whether the plaintiffs have proved themselves free from contributory negligence." While this restriction was obviously right, it gave the plaintiffs no more favorable consideration than they were entitled to. If upon their own appeal to the man who was to all appearances

· both the responsible and active head of the entire work, they were assured by him that their building would be adequately protected without further action on their part, they were of course entitled to show this when an attitude inspired by his assurance was charged against them as conclusive evidence of their own negligence. Nor is there force in the defendant's claim that upon the plaintiffs' own showing they were negligent in their inactivity prior to June 14th—the conceded date of the Huber-Douglas interview. After-events show that there was ample time and opportunity following that interview to take effective measures for the building's security. If, as the plaintiffs urged, they refrained from themselves then taking such measures because of a definite and positive promise that the defendant would assume that responsibility, the situation before that date, so far as having any claimed significance adverse to the plaintiffs, ceases to be material. In that event, the controlling test of conduct is limited in its application to the period between the time of the promise and that of the Cady building's collapse. The charge of the court upon this branch of the case was adequate, and sufficiently covered such points embraced in the defendant's requests as were proper to go to the jury.

Several reasons of appeal, and the stronger part of the defendant's case, rest upon the complaint that the court in its charge imposed too great a burden upon the defendant in the degree of care demanded of its treatment of the Cady building. The criticism which necessarily underlies this branch of the case involves numerous detached portions of the charge, and as not infrequently happens, these gain nothing in intelligent and cohesive statement by the loss of an enlightening context. The essence of the defendant's complaint seems to be, (1) that the court by an unqualified use of the word "protection" in certain detached references to

the measure of the defendant's duty to the Cady prop-
erty, not only relieved the plaintiffs from all responsibil-
ity for its care and safety during the entire progress of
the work, but centered all responsibility in the matter
for that whole period upon the defendant; and (2)
that the court failed to sufficiently inform the jury
what conduct was fairly demanded of the plaintiffs
and the defendant to satisfy the requirements of the
rule as to reasonable care in its application to either.

The charge reasonably read in its entirety refutes both
claims. It fairly summarizes the pleadings, defines the
specific grounds of negligence which the first count dis-
closes, and proceeds to an obviously correct instruction
upon the law of lateral support, and a clear caution as
to the limits of its relation to the case on trial. "'The
owner of land,'" says the court in quoting from
*Ceffarelli* v. *Landino,* 82 Conn. 126, 129, 72 Atl. 564,
"''is entitled to have his soil in its natural condition
supported by the adjoining land, but this right to lateral
support does not extend to buildings or other super-
structures placed upon the land. . . . The adjoining
owner, . . . if he excavates so near the line that his
neighbor's soil, by reason of its own weight or the ac-
tion of the elements, is liable to give way, must sup-
port it by artificial means, or answer in damages if it
falls into the excavation. But if there are buildings
upon the neighbor's land, these increase the lateral
pressure, and if the giving way is due to this added
burden, the person excavating is not liable, in the ab-
sence of negligence in conducting the work, for the
damage so resulting to the owner.' In this case, the
natural right of support existed in respect of the Cady
land only, and not of the Cady building." This in itself
sufficiently disposes of any claim that the court erred
in its instructions upon the basic law of the situation,
and this compact and correct statement of the law be-

came the central and controlling note of the court's whole treatment of the subject. It brings into clear relief the essential bearing of negligence, and the fact that this negligence must characterize the defendant's conduct in dealing with the Marsh property, to create any liability for results harmful to the Cady property. The court then emphasizes the proposition in this language: "The Douglas Company, however, in making an excavation on the Marsh land, as well as in taking down the Marsh building, was bound to use reasonable care in the prosecution of the work, and would be liable for injury to the plaintiffs' property resulting from negligence."

Thenceforth the jury are under constant reminder from the court that the defendant's duty was that of an ordinarily prudent man "under the circumstances in which the Douglas Company was placed," that is, circumstances which implied "the ordinarily prudent man's" absolute right to pursue any method whatever in the removal of his building provided only that the method be a reasonably careful one—for this is the unmistakable meaning of the extracts from the charge already referred to. The court nowhere assumes to dictate to the jury, or to advise them what method or what specific acts of the defendant would satisfy the legal standard of care devolving upon it. They are properly left to determine what the conduct was, and to apply the test submitted by the court to further determine whether it was sufficient "under the circumstances" to absolve the defendant from a charge of negligence. So, too, when the court leaves it for the jury to say whether the defendant "did all that an ordinarily prudent man, in its place, would have done for the protection of the Cady building, in removing the other building, in preparing for, and in making, the excavation," it properly assumes that a discriminating

intelligence will be brought to bear in weighing the court's cautious qualifications, already given, as to the degree or sort of "protection" owed by the defendant or by one "in its place." The court is not here using the word "protection" in any broad and unlimited sense, as the defendant would persuade us, but using it with distinct reference to a limited and circumscribed duty already defined by the charge with a clear statement of its restricted bearing—the duty of proceeding with reasonable care. The extent of this duty can be accurately measured only by the exact conditions of the case calling for its exercise. What amounts to satisfactory performance of it in one situation, falls short of its fulfilment in another. Indeed, while it would have been grossly inaccurate, of course, for the court to intimate to the jury that the burden of furnishing protecting support by shoring or some other similar method is always cast upon one in the defendant's position— it would have been hardly less so to tell them, without qualification, that the necessity to furnish some such support is never cast upon one so placed. Conditions may clearly exist which "will necessitate protection of some kind because of the duty of exercising reasonable care." 1 Corpus Juris, 1219, and cases cited; and "protection of some kind" naturally means protection of the kind most reasonably adapted to the situation— whether it be shoring or something else.

It was therefore quite within the jury's exclusive province to say what was demanded of the defendant to give its conduct the essential quality of reasonable care, and to determine with reference to both what it did and what it neglected to do, whether its course filled the full measure of its duty to the plaintiffs, or left something more to be done—even to the extent of shoring the exposed wall. The summarized statement of the pleadings,—involving, as they did, so far

as the trial court's responsibility was concerned, the law behind all three counts of the complaint—and the statement of the respective claims of the parties in presenting the case to the jury, forcibly expose the complex character of the situation which confronted both the court and the jury.   When it is remembered that the jury could pass intelligently upon the matters involved in the first count only after carefully determining the extent and practical bearing upon them of each of the several grounds of negligence relied upon, not only as independent factors, but in all their intricate and interdependent combinations, it is apparent that the court's course in dealing with this branch of the case was well chosen for its task.   It emphasized the duty of reasonable care on the part of the defendants, and by sufficient reference to the various acts and omissions which were challenged by the plaintiffs as showing a lack of such care, it adequately defined the situations particularly calling for its exercise; it persistently cautioned the jury that the same standard of care was demanded of the plaintiffs in their relations to the matter, and it correctly outlined the different grounds of negligence as pursued by the plaintiffs, and fairly assigned to them their places of relative importance to the case.

In the stress which the defendant lays upon its own claimed immunity under a too narrow interpretation of the law of lateral support, it seems to practically overlook the equally important correlative rule which still holds one in its position to the strict exercise of reasonable care.   This "is not based upon any right of property in adjacent land for support of buildings or otherwise.   It is simply a restraint upon reckless and unnecessary conduct in respect to the use of such adjacent property, fraught with danger to the building.   Its justification is found in a well-established principle,

having wide application in English and American jurisprudence, and its application to cases of this kind is as well settled as the doctrine that the owner of a building has no right of support therefor in the land of an adjacent owner. The two propositions are asserted, side by side, in the same decisions, and in practically all of them." *Walker* v. *Strosnider*, 67 W. Va. 39, 46, 67 S. E. 1087.

We find no real warrant for the defendant's claimed grievance, that the court impliedly gave the jury to understand that shoring, or some equivalent measure for the protection of the Cady building, was imposed as a matter of law upon the defendant, and that, quite regardless of the circumstances of the case, its absence imputes negligence.

But there is another aspect of the matter which makes it relatively unimportant to discuss at length the respective attitudes of the parties before the Huber-Douglas meeting on June 14th. There is a controlling significance on this branch of the case, in what they did, or failed to do, between that date and the time of the building's collapse—six days later. The plaintiffs' claim here necessarily rested upon their admission of knowledge as early as June 14th of a situation threatening grave and immediate danger to the Cady building. This was their avowed reason for the interview which Huber sought, acting not alone for his partnership but for the absent owner. Something for the protection of the building must be done at once; it remained only to be determined who should do it. With that attitude of the plaintiffs established, as it very clearly was to the jury, it makes no difference that the parties are not in accord as to what took place on that occasion, because, whatever occurred, the plaintiffs are conclusively upon record as admitting such knowledge of the situation as called upon them for

immediate action for the safety of the building unless they were definitely promised that the Douglas Company would itself take such action. Moreover, it is obvious, upon the admitted facts of record, that the word of Douglas was the word of his Company. The court, it is true, left it for the jury to determine whether that was so, but upon the conceded facts that he was its president, its manager, its "head," and in personal charge of the work, the court might well have taken the responsibility of charging the jury as matter of law that his promise, if he made one, bound the defendant. If the plaintiffs could not safely look to him to speak with the Company's authority, there was apparently no one to whom they might appeal. There was too, as we have already said on another phase of the case, abundant opportunity after June 14th to fully secure the safety of the building. If the plaintiffs thereafter desisted from doing anything to this end because of a definite promise of the Douglas Company to do so, this absolves the plaintiffs from negligence—as the court in plain effect told the jury—and charges the responsibility for the collapse to the Douglas Company, if the lack of support caused it. If, on the other hand, the Douglas Company made no such promise, then the plaintiffs, under the positive charge of the court imposing upon them the duty of reasonable care in the protection of their property, were guilty of effective negligence in view of their knowledge of the situation, its imperative demands, and their confessed failure to meet these demands. This issue was fairly submitted to the jury under instructions that gave deserved prominence to the interview, and to its substance—whatever that might prove to be. If the jury observed them, and we must so assume, their verdict is conclusive that they found for the plaintiffs upon this vital feature, and it is fully warranted by such a finding. Had they dis-

credited the plaintiffs on this branch of the case, their verdict, under the only construction of the court's instructions reasonably open to them, must have been for the defendant.

The defendant claimed upon the trial, and sought to enforce the claim by the offer of evidence, that structural defects of the Cady building, and weaknesses which age had developed in it, were responsible for its collapse.   Although a portion of the charge dealing with this subject is embraced in one of the grounds of appeal, we understand that such force as the defendant claims from it in disclosing error in the charge, is in connection with other assignments already discussed. In any event, the charge upon these matters was clearly correct.

Certain assignments of error are based upon portions of the charge dealing specifically with the law involved in the second and third counts of the complaint.   These become immaterial with the removal of that part of the plaintiffs' case from consideration.   The criticism of the court's summarizing statements of the pleadings and of the evidence, has no merit, and the court's failure to charge in the language of the numerous requests of the defendant, was not error.   It is enough to say that many of these requests are disposed of by our treatment of corresponding portions of the charge as given, and that nothing in the rest of them calls for independent notice.

There is no error.

In this opinion the other judges concurred.