## MEINRATH BROKERAGE CO. v. COLLINS–DIETZ–MORRIS CO. *

(Circuit Court of Appeals, Eighth Circuit. April 21, 1924.)

No. 6387.

1. Frauds, Statute of ⊂⊃23(1)—Oral promise held direct, and not collateral, and not within the statute.

An oral agreement by defendant that, if plaintiff would take up certain bills of lading by payment of drafts attached, for which plaintiff was not liable, and forward the bills of lading with drafts attached for acceptance by another, who had also been released from obligation to accept the same, as both parties knew, defendant would make good any loss sustained by plaintiff, *held* a direct and not a collateral promise, and not within the statute of frauds.

2. Frauds, Statute of ⊂⊃23(1)—Construction of promise determined by situation of parties.

The construction of a promise, to determine whether or not it was collateral, within the statute of frauds, does not depend so much on the language of the promise as on the situation of the parties, and if the promisor had a personal or pecuniary interest to be served, the court will give effect to the promise.

3. Appeal and error ⊂⊃204(1), 719(5), 1053(2)—Admission of immaterial evidence, not objected to nor assigned as error, and which jury were instructed to disregard, not ground for reversal.

Admission of evidence, which, though immaterial, was not objected to, nor its admission assigned as error, and which the jury were instructed to disregard, is not ground for reversal.

In Error to the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Action at law by the Collins-Dietz-Morris Company against the Meinrath Brokerage Company. Judgment for plaintiff, and defendant brings error. Affirmed.

B. A. Ames, of Oklahoma City, Okl. (C. B. Ames and Ames, Lowe & Richardson, all of Oklahoma City, Okl., on the brief), for plaintiff in error.

C. B. Stuart, of Oklahoma City, Okl. (J. F. Sharp, W. F. Wilson, and John Tomerlin, all of Oklahoma City, Okl., on the brief), for defendant in error.

Before LEWIS, Circuit Judge, and SYMES and PHILLIPS, District Judges.

SYMES, District Judge. The parties mentioned in this record are: The Collins-Dietz-Morris Company, referred to as Collins, plaintiff below, wholesale grocers, located in Oklahoma City; the Meinrath Brokerage Company, referred to as Meinrath, defendant below, merchandise brokers, with offices in Oklahoma City and elsewhere; the Alton Mercantile Company, referred to as Alton, wholesale grocers of Enid, Okl.; and W. H. Edgar & Son, referred to as Edgar, of Detroit, Mich.

It appears that Alton had purchased from certain refiners 1,500 bags of sugar (100 pounds each), with the intention, like the other parties concerned, of reselling. On April 23, 1920, Meinrath, acting as

broker, sold this sugar for Alton to Collins at 26 cents, and on the 29th of April following Collins in turn, through Meinrath, as broker, sold it to Edgar at 27 cents. It is admitted by all that the details of these sales are ordinarily handled by the broker, and these particular transactions were no exception. Accordingly, Edgar directed Meinrath to have the sugar shipped in three cars, of 500 bags each, consigned to three separate destinations. These instructions were transmitted by Meinrath to Alton, but not to Collins. In due course the sugar was shipped to Edgar by the refinery, but not in accordance with the latter's instructions. This, it is admitted, gave Edgar a legal excuse for nonperformance of his contract with Collins that he promptly took advantage of.

Alton, as was customary, drew drafts on Collins with bills of lading attached, sending copies of the invoices to Meinrath. These were presented to Collins through a bank on June 15th. Collins gave checks in payment, and took up the drafts and bills of lading, in ignorance of the mistake made in the shipping instructions. When Meinrath received copies of the invoices, they discovered that Alton had disregarded the shipping instructions. Mr. Gillespie, a representative and employee of Meinrath, immediately called up Collins and inquired as to the point of origin of the shipment. Collins asked why this information was desired, whereupon Gillespie stated that Alton had shipped the consignment in two cars, instead of three, and had also made a mistake in destinations. He admits that he did not call Collins to inform him of the mistake. Collins immediately returned the bills of lading and drafts to the bank and received back his checks. Thereafter Meinrath tried to persuade Collins to pay the Alton drafts, assuring them that Edgar would waive the mistake and accept the shipment. This Collins declined to do, unless Meinrath would first obtain assurances from Edgar to that effect, which were not forthcoming.

The day following Gillespie, representing Meinrath, went into conference with the Collins firm and renewed his request that they take up the Alton drafts, and according to Collins' story orally promised that if Collins would recall and pay the Alton drafts, and draw drafts with bills of lading attached on Edgar, that Meinrath would pay Collins any loss or damage they might sustain thereby. Meinrath denies that any such promise was made. Collins further states that in reliance upon this promise he thereupon paid the Alton drafts and forwarded the bills of lading to Edgar with drafts attached. A day or so later Edgar informed Meinrath that he would not pay the drafts, and on June 21st the same were duly protested. Upon learning of this Collins notified Meinrath that they would look to them for reimbursement in accordance with the oral guaranty.

Meinrath immediately got in touch with Edgar, and stated that there had been an error in the shipment, and asked them to help them (Meinrath) out. An arrangement was thereupon entered into between them, by which Edgar was allowed to take the bills of lading from the bank, divert the cars to new destinations, unload part of the same at Detroit, and attempt to dispose of the sugar. Collins, at Meinrath's request, instructed the bank accordingly, and, further, to reduce the drafts $200

to cover Alton's expenses caused by this change. This is what is known as the trust receipt agreement.

A short time after the Detroit bank again took up the matter of payment with Edgar, who claims that immediate payment was demanded, contrary to the new understanding. Edgar refused to pay and declined to have anything more to do with the transaction. This action was based upon a letter that the Detroit bank received from its correspondent bank in Chicago, through which the drafts and bills of lading went. The evidence shows that this communication was one of inquiry only as to the status of the matter, and all the Detroit bank did was to call in Edgar's representative, who read the letter. Edgar was not justified in construing it as a demand for immediate payment. In any event Collins was not responsible for this and is not liable for Edgar's refusal to pay the drafts. The bills of lading were thereafter returned to Meinrath, who proceeded to sell one of the two cars of sugar and remitted the proceeds to Collins, who gave him credit for the amount. The balance Meinrath stored, and as far as the record shows was never disposed of. Collins thereupon brought this suit against Meinrath on its guaranty for the loss they had sustained.

The jury, under proper instructions, found as a matter of fact that Meinrath had made the oral promise to save Collins harmless on account of having paid the Alton drafts, after Edgar's refusal to go ahead with the first deal. There was a clear conflict of evidence on this question, and we see no reason to disturb the finding. The questions we find necessary to discuss are: First, whether the oral promise that the jury found Meinrath made to Collins is void under the statute of frauds; and, second, error in the admission of evidence.

[1] On the first question the defendant, in its requests 1 to 4, inclusive, asked the court in effect to instruct the jury that the statute of frauds was a defense to this suit. The defendant's argument on this point is, in brief, that at the most it was the intention of the defendant that it should only be collaterally liable, and was to pay only in case Edgar defaulted on his agreement to purchase, and, not being in writing, fell within the statute of frauds, and was therefore void. This is a sound proposition of law, but a careful review of the record convinces us that the facts do not justify its application to this case. It assumes that at the time Meinrath made this promise Edgar was bound, or under some obligation to Collins, for the performance of which Meinrath made itself liable. It is clear, however, that, at the time the conversation in Collins' office took place, Edgar was under no liability to Collins.

Alton's failure to give proper shipping directions had relieved Collins from their agreement with Alton, and likewise released Edgar from his obligation to Collins; so there was no existing liability of Edgar in favor of Collins that Meinrath could have guaranteed. The conduct of the parties at the time showed this to be their understanding. Meinrath admitted in effect that Collins had the right to turn down the Alton drafts. As we construe the agreement that the jury found was entered into Meinrath in effect said to Collins: If you will pay Alton, in spite of his breach, and then draw on Edgar, and see if he will not waive

the mistake, and take and pay for the sugar, we will see that you suffer no loss. And Collins, relying upon this, voluntarily paid Alton, to whom he was not liable, took the bills of lading, and sent them with drafts attached to Edgar, who was under no obligations to Collins.

Counsel for plaintiff in error overlooked the important fact that Meinrath not only stated he would be liable to Collins in the event Edgar refused to take the shipment, but that he specifically requested Collins to pay Alton a sum of money that Collins had already refused to pay. It is clear, therefore, that Meinrath's engagement was an original agreement, and clearly not subject to the defense of the statute. 27 Corpus Juris, § 15, p. 130, and cases cited; Davis v. Patrick, 141 U. S. 479, 12 Sup. Ct. 58, 35 L. Ed. 826; Knight v. Kiser (C. C. A.) 271 Fed. 869; Lindley v. Kelly, 47 Okl. 328, 147 Pac. 1015; 27 R. C. L. pp. 483–484.

[2] Counsel for plaintiff in error stress the form or exact words of the conversation that resulted in this oral promise, but according to Davis v. Patrick, supra, the construction of the promise does not depend so much upon the form of expression used as upon the situation of the parties, and holds that, if the promisor has a personal or pecuniary interest in the matter, the court will give effect to the promise; otherwise, if the promisor is a stranger thereto. Meinrath was the most active participant in the various deals and showed great concern and activity when advised that the two sales had fallen down. Everything that occurred thereafter was the result of his active participation and solicitation, and can be explained on no other ground than that he was subserving some pecuniary or business purpose of his own.

This situation is not changed by the subsequent transactions referred to as the trust receipt agreement. That was brought about solely by Meinrath, and what Collins did therein was to accommodate the former. Edgar's failure to perform, whether justified or not, cannot be laid at the door of Collins, for Meinrath knew at the time that Collins was looking to him for reimbursement. The court, however, submitted Meinrath's theory of the trust agreement, and Collins' alleged breach of it to the jury, under proper instructions.

[3] A serious question is presented by the admission of evidence to the effect that Meinrath in turn had a guaranty from Alton to protect them on their liability to Collins. This is shown by Meinrath's letter to Alton of April 22, 1922, and oral testimony of Dietz and Morris. It was clearly immaterial and tended directly to prejudice the jury. This guaranty was first referred to in the direct examination of Mr. Morris, where he stated that in a conversation with Gillespie the latter said.:

"Immediately on leaving our office after agreeing to protect us against any loss, that he called the Alton Mercantile Company at Enid and that Alton Mercantile Company agreed to protect them fully in case they sustained any loss by reason of their agreement to protect us. He says he couldn't get Alton to do anything, they couldn't get him to make a move. And I told him I didn't see where we were gaining anything by waiting; that the case wasn't changing any; that the value of the sugar wasn't going to increase any; that, if anything, it would be worth less; the thing was getting worse instead of better all the time. But at the same time he kept asking us to wait and said they would work it out some way. As a result we waited about six or eight months before we brought any action against them."

No objection was made to this. Later, objection was made to other oral testimony on this subject; yet, when the letter was produced, counsel for the defendant stated they had no objection to it being offered in evidence, and in fact suggested that it be shown the witness. The court in its instructions told the jury to disregard it in passing on defendant's liability. Further, we do not find this assigned as an error. For these reasons it is not grounds for reversal.

The judgment of the lower court is affirmed.