DELAWARE FEED STORES
*vs.*
FIRST AUBURN TRUST COMPANY

Cumberland.   Opinion, January 13, 1956.

*Preti & Preti,*
*Sidney W. Wernick,* for plaintiff.

*John G. Marshall,* for defendant.

SITTING: FELLOWS, C. J., WILLIAMSON, BELIVEAU, TAPLEY, JJ. WEBBER AND CLARKE, JJ., did not sit.

WILLIAMSON, J.   This is an action in assumpsit by a feed store to recover a balance due for grain delivered at the Bishop Poultry Farm and there used to feed a flock mortgaged to the defendant bank. The presiding justice in the Superior Court who heard the case without a jury and with right to except in matters of law reserved, found for the plaintiff for the balance of the account with interest, or $1933.85. Exceptions by the defendant are overruled.

The decision turns upon the meaning and effect of an agreement between the plaintiff and the defendant made by their attorneys. Broadly stated, the issue is whether there was any evidence of probative value from which the presiding justice could find liability either for unjust enrichment or upon an implied contract under the money count for goods sold and delivered. The plaintiff denies that it seeks to recover on a guaranty by the defendant to pay the debt of another.

The presiding justice made no specific findings of fact and gave no reasons for his decision. If from the record there may be found a path leading to liability on either of the stated grounds, the exceptions must be overruled. In our view of the case it is necessary to consider only the exceptions charging error in basing liability upon an implied contract.

The familiar rule of *Sanfacon* v. *Gagnon,* 132 Me. 111, 167 A. 695 (1933) is applicable. The court said, at page 113 (citations omitted) :

"Inasmuch as the presiding Justice made no specific findings of fact, it must be assumed that he found for the defendants upon all issues of fact necessarily involved. . . He is the exclusive judge of the credibility of witnesses and the weight of evidence, and only when he finds facts without evidence or contrary to the only conclusion which may be drawn from the evidence is there any error of law."

In brief and without detail the presiding justice could have found the following facts:

On May 18, 1954 at a meeting attended by representatives of Delaware Mills, the National Bank of Commerce and the defendant, three of the largest creditors of Mr. Bishop, it was arranged that, Mr. Bishop would make an assignment for the benefit of creditors in an attempt to avoid bankruptcy. The plan called for the continued operation of the poultry farm by trustees; namely, Mr. Preti, attorney for Delaware Mills and the plaintiff, Mr. Despins, attorney for the defendant bank, and Mr. Hinckley, attorney for the National Bank of Commerce. It was known that Delaware Mills on May 17 had made a real estate attachment covering the Bishop farm. There appears to have been some confusion between Delaware Mills (a Delaware corporation) and the plaintiff Delaware Feed Stores (a Maine corporation) arising from the similarity of names. The confusion, however, in no way affects the issues before us. From this point Mr. Preti and Mr. Despins become the principal actors with full authority to speak and act for their clients.

By agreement of the interested parties Mr. Preti prepared the assignment and, after it was executed by Mr. and Mrs. Bishop, conferred in Auburn on May 20 with Mr. Despins and Mr. Marshall, attorneys for the defendant. In the course of the conference the attorneys came to the conclusion that Mr. Bishop, as a poultry farmer, could not be put

into involuntary bankruptcy. The real estate attachment by Delaware Mills at once became an important factor. In light of this new information Mr. Preti would not agree to discharge the attachment, and the defendant's attorneys indicated that the bank might not join in the assignment. No decision by the bank was reached at the meeting and the draft of the assignment was left with its attorneys.

On the same day Mr. Bishop's attorney notified the three proposed trustees "that there was grain enough on the premises at the Bishop farm in Gray to last only through May 21, 1954." This information was contained in a letter delivered to Mr. Preti and reached Mr. Despins from Mr. Preti on the 21st.

We come to the agreement on which the case rests made on May 21 by Mr. Preti and Mr. Despins by telephone. For our purposes the oral agreement is sufficiently set forth by Mr. Preti in a letter to Mr. Marshall on June 10, as follows:

> "As a result of our recent phone conversation (June 10th) with regard to the First Auburn Trust Company having guaranteed the credit given to Mr. Despins, myself and Mr. Hinckley as Trustees under the assignment during the period from May 21 to June 2 inclusive, I called Mr. Despins by phone and confirmed the fact with him that I had originally (that is on May 21) on behalf of the Trustees agreed with Mr. Despins that he, as a Trustee, together with Mr. Hinckley and myself, would run an open account with Delaware Feed Stores in South Portland for the purpose of buying feed at Bishop Poultry Farm.

> "I explained to Mr. Despins at the time of this first conversation that I had discussed with Delaware Feed Stores the fact that no monies, or at least not sufficient monies, would come into the hands of the Trustees for at least ten days with which to pay this open account. I further discussed with Mr. Despins that because of the instability of

> the entire transaction Delaware Feed Stores required as a condition precedent to credit to the Trustees the guarantee of the First Auburn Trust Company of the Trustees' account with Delaware Feed Stores. Mr. Despins, during our recent phone call confirmed the fact that he had called the bank at my request and received their confirmation that they would guarantee the Trustees' account and that he immediately called me by telephone and informed me of this guarantee, whereupon I called Delaware Feed Stores and told them that with this guarantee they could extend credit service to the Trustees."

On the strength of this agreement the plaintiff delivered grain at the Bishop farm from May 21 to June 2. The charge of $2389.35 represented the fair market value of and a reasonable charge for the grain. The farm remained in the possession and control of Mr. Bishop, and after June 2 he furnished the grain.

The assignment for the benefit of the creditors was not completed and never became effective. On June 10 Mr. Preti learned that the defendant would not join and this ended the proposal for an assignment. On the same day he received $704.88 from Mr. Bishop's attorney coming from monies received by Mr. Despins as Trustee from sales from the farm. After deduction of charges for preparation of the papers, Mr. Preti caused the balance of $529.88 to be credited by the plaintiff on the grain account. No further payments on the account were made by Mr. Bishop or his attorney.

In writing to Mr. Despins on July 3rd, Mr. Preti said, in part: "Of course, Delaware Feed Stores never intended to look to Mr. Bishop on *this* account but only to the Trustees and in the event of their default, to the bank which guaranteed it." Again on August 10 Mr. Preti wrote Mr. Despins: "Since it is obvious that the Trustees have no further funds

and the trust is completely out of the question and will probably never come into existence again I, representing Delaware Feed Stores must now look to the guarantor, namely the First Auburn Trust Company in accordance with your agreement with me at the time that said account was guaranteed."

The defendant's position in substance is that the agreement between the plaintiff and the defendant was at most to pay the deficiency in the account of the trustees conditional upon the trustees qualifying under a completed and effective assignment for the benefit of creditors. To use Mr. Despins' words in a letter to Mr. Preti: ". . . you seem to have overlooked the fact that the agreement of the First Auburn Trust Company to guarantee the trustees' account with the Delaware Feed Stores was predicated on the assignment for the benefit of creditors going through." It is unnecessary in our view to discuss other objections touching the legal sufficiency of such a guaranty based on asserted lack of acceptance and notice of extension of credit by the plaintiff and on the application of the Statute of Frauds. R. S., c. 119, § 1-II (1954).

Without question, the words of the May 21st agreement are words commonly found in a guaranty. It was at least the hope of the parties that the grain bill would be paid from the income of the business and not by the defendant. It does not necessarily follow, however, that the agreement was a collateral undertaking to guarantee the debt of another and was not the proper basis of an implied contract for purchase of the grain.

The fact finder must seek and give effect to the intention of the parties.

"In ascertaining to whom credit was extended, the intention of the parties must govern. This intention should be ascertained from the words used

in making the promise, the situation of the parties, and all the circumstances surrounding the transaction. The real character of the promise does not depend altogether on the form of expression, but largely on the situation of the parties; and the question is, always, what the parties mutually understood by the language, whether they understood it to be a collateral or a direct promise."

*The Hines & Smith Co.* v. *Green,* 121 Me. 478, 480, 118 A. 296, 297 (1922). See also *Drummond and Hospital* v. *Pillsbury,* 130 Me. 406, 156 A. 806 (1931) ; *Davis* v. *Patrick,* 141 U. S. 479 (1891) ; *Duca* v. *Lord,* 331 Mass. 51, 117 N. E. (2nd) 145 (1953) ; 49 Am. Jur., Statute of Frauds §§ 65, 90-95; 37 C. J. S. Frauds, Statute of §§ 14-16.

The question is whether the promise of the defendant was an original or collateral undertaking. Did the defendant promise to pay the primary liability of another? If so, the undertaking was collateral and a guaranty. Or did the defendant incur a direct and primary liability for the grain?

There are several considerations based on evidence of probative value which may have led the presiding justice to his decision.

First: The agreement was made with relation to the existing need for grain that very day. Without grain the Bishop Poultry Farm would cease operations.

Second: The agreement was not conditional upon the assignment becoming effective. No such condition was stated in the telephone conversations of May 21. At that time the defendant held the assignment and had not determined whether it would join therein.

Third: Surely it was fairly the intention of the plaintiff and the defendant that someone would be primarily liable for the purchases of grain from May 21 to June 2 upon delivery. The defendant was not taking the risk that the as-

signment would be completed, or that the prospective trustees would later become legally qualified trustees with authority to utilize funds for payment of the account.

Fourth: The fact that the grain was charged to the prospective trustees was not conclusive evidence that credit was extended to them. The entry was subject to explanation and was explained by Mr. Preti. See *The Hines & Smith Co.* v. *Green, supra.*

Fifth: The trustees at no time became liable for the account either as trustees or personally. They were never legally qualified trustees for the assignment creating the trust did not become effective. There is no suggestion that the plaintiff or defendant (or Mr. Preti or Mr. Despins, acting for the parties) intended that the trustees or any of them should have any personal liability in the matter. Mr. Hinckley, the third prospective trustee, indeed does not appear to have had any knowledge of the May 21st agreement. He was informed of the need for grain and there apparently his knowledge ended.

Sixth: Mr. Bishop admittedly was not liable for the grain.

Seventh: With the exclusion of Mr. Bishop and the Trustees, there remains no one with a primary liability for the grain to which the promise of the defendant could be collateral. Hence the defendant was primarily or directly liable therefor.

In *Duca* v. *Lord, supra,* the Massachusetts Court discusses the principles governing the case at bar. The plaintiff made repairs on library property in addition to the requirements of a written contract with the trustees on the oral promise of Deferrari, who directed the work, that "If the library doesn't pay you I will pay you."

The court held the promise was not within the Statute of Frauds for lack of a primary obligation, citing among other authorities Williston on Contracts § 454 (rev. ed.) and Restatement, Contracts § 180. "In short there was no obligation on the part of the trustees to which Deferrari's promise could be secondary." Then turning to the question of the mutual understanding of the parties the court, in affirming judgment for the plaintiff said:

> "Nor is this a case where the parties intended that unless such a primary obligation came into existence there was to be no liability on the part of Deferrari. We think the true situation was that both parties hoped that the trustees would assume the obligation but if that hope was not realized then, in any event, Deferrari was to pay for the extra work."

*Mountstephen* v. *Lakeman,* L. R. 7 Q. B. 196 (1871), affirmed in L. R. 7 H. L. 17 (1874), is a leading English case on the issues before us. The plaintiff had been employed to construct a main sewer by a local board of health of which the defendant was chairman. On defendant's request that the plaintiff make certain sewer connections with houses, the plaintiff said, "I have none (no objections), if you or the board will order the work, or become responsible for the payment." The defendant replied, "Go on and do the work, and I will see you paid." The plaintiff did the work but the board, alleging that no orders had been given for the work, declined to pay. Justice Willes said, at page 201:

> "But it was competent to a jury to find,—and I need go no further than that, though I think it would have been the proper conclusion to draw,— that the meaning of the answer of the defendant was not 'I will be liable as surety for the board, if they become liable to you,' making the contract one of suretyship; but 'Whether the board be liable or not, do the work and you shall be paid;' that is, 'I undertake to pay you for the work, unless you

should happen to be paid either by the board or by the owners, assuming they come forward and pay, though they are not liable.' That appears to me to be the result of the conversation. It is a bargain, therefore, by the defendant to pay for the work, though it was known that there was no person liable at the time, and whether a third person should become liable in future or not, that is, whether or not there was, or might be, a third person who could be liable for a debt, or guilty of a default or miscarriage in the matter. And it is only in respect of such a third person that the Statute of Frauds applies."

In *Doyle* v. *White,* 26 Me. 341 (1846) the plaintiff refused to deliver rock to X under his contract on X's credit. The defendant said, "You bring the rock and I will see you paid for it." The promise was found to be a guaranty and within the statute. The importance of the case to us is that whether the promise was original or collateral was a question of fact for the jury. See also *Hammond Coal Co.* v. *Lewis,* 248 Mass. 499, 143 N. E. 309 (1924).

On close examination of the defendant's promise in the frame of the existing situation, the reasons for the decision of the presiding justice become clear. If the promise when made had value for the plaintiff, as of course was intended, it covered the purchase of grain in the event the assignment did not become effective. There is no sufficient ground advanced for disturbing the action below.

The entry will be

*Exceptions overruled.*