**Bernard J. LEE, Plaintiff-Appellant,**

v.

**JENKINS BROTHERS et al., Defendants-Appellees.**

**Bernard J. LEE, Plaintiff-Appellant,**

v.

**Farnham YARDLEY, Defendant-Appellee.**

**Nos. 66, 67, Dockets 24965, 24966.**

United States Court of Appeals Second Circuit.

Argued Jan. 12, 1959.

Decided June 15, 1959.

Hand, Circuit Judge, dissented in part.

Samuel Gruber, Stamford, Conn. (Gruber & Turkel, Stamford, Conn., on the brief), for appellant.

Morgan P. Ames, Stamford, Conn. (Cummings & Lockwood, Edward R. Mc-Pherson, Jr. and Francis J. McNamara, Jr., Stamford, Conn., on the brief), for appellees.

Before HAND, MEDINA and BURGER, Circuit Judges.

MEDINA, Circuit Judge.

Bernard J. Lee appeals from a judgment dismissing his complaint in two consolidated actions against Jenkins Brothers, a corporation, and against Farnham Yardley, to recover pension payments allegedly due under an oral agreement by Yardley on behalf of the corporation and for his own account, made in 1920. Lee's case consisted only of his own testimony and the trial judge held that there was no issue for the jury, as the claim was barred by the Connecticut Statute of Frauds and, as to the corporate defendant, was unsupported by proof that the agreement was authorized.

For the purposes of clarity and organization we shall first state our decision on the various law points involved

in this interesting case. The discussion of the legal questions will follow a description of the factual background of the controversy. As the case may be reviewed by the Supreme Court we shall treat each of the important and controlling questions of law raised at the trial.

(1) First, we hold that Lee's testimony presented no issue of fact on which reasonable men could differ on the subject of the making of the alleged agreements, and that therefore the dismissal of the complaints in both actions was proper.

(2) Assuming, *arguendo*, that there was evidence sufficient to support a finding that Yardley promised Lee a pension of not to exceed $1500 at the age of 60, even if not employed by Jenkins at that time, we find that, while there is no proof of actual authority, the combination of circumstances here present would, if we assume such a promise was made, make the question of apparent authority an issue for the jury.

(3) With respect to the applicability of the Connecticut Statute of Frauds to Yardley's alleged oral promise, we conclude that it is probable that Connecticut would hold: (a) that Yardley was being held to answer for "the debt, default, or miscarriage of another" whether or not there was a binding obligation on the part of the corporation; and (b) that the requirement that the promise be in writing, if it cannot be performed within one year, is complied with because of Lee's alleged complete performance.

The following is a summary of Lee's testimony. At the time of the alleged contract Lee was in the employ of the Crane Company, a large manufacturer of valves, fittings and plumbing supplies, at the company's Bridgeport plant. He had been with the Crane Company for thirteen years and had risen to the post of business manager, earning a salary of $4,000 per year. In December, 1919,

the Crane Company agreed to sell its Bridgeport plant to Jenkins Brothers, a New Jersey corporation and a defendant in one of these actions. The transaction was consummated June 1, 1920 when Jenkins took over Crane's Bridgeport plant.

According to Lee's testimony this was the first venture into the manufacturing phase of the business for Jenkins, which was formerly content to be merely a customer of Crane. Jenkins was therefore extremely anxious to secure competent personnel, particularly the old Crane employees, in order to insure as smooth a transition as possible in view of the change to a relatively inexperienced management.

With this in mind Charles V. Barrington, Vice President of Jenkins in charge of manufacturing, approached Lee in February, 1920, in an attempt to induce him to join Jenkins. Lee, however, was reluctant to do so. He felt his prospects with Crane were good and he had accumulated thirteen years of pension rights under the Crane Company plan which he did not want to give up. Some time after this conversation but before June 1, 1920, Barrington arranged a meeting for Lee at his hotel suite in Bridgeport with the co-defendant Yardley, president of Jenkins, chairman of the board of directors, a substantial stockholder, son-in-law of Mr. Jenkins, and co-trustee of the Jenkins estate. Present at this meeting besides Lee and Yardley were Barrington and his wife. However, at the time of the trial in October, 1957, only Lee was alive to describe the conversation.[1]

Yardley convinced Lee of his fine prospects with Jenkins, of the company's need for him as assistant to Barrington, and allegedly made a promise on behalf of Jenkins and a promise on his own behalf with respect to Lee's pension rights. Since the content of these promises is so vital to the determination of the various aspects of this case, we set out in full the

1. Lee instituted his suit against Jenkins Brothers September 12, 1955, and against Yardley May 29, 1956. At both of these times Yardley was alive but blind. He died shortly thereafter and before the trial at the age of 87.

various versions of the conversation with Yardley as given by Lee.

First, Lee testified:

"As far as the pension that I had earned with Crane Company he said the company [Jenkins Brothers] would pay that pension (and) if they didn't or, if anything came up, he would assume the liability himself, he would guarantee payment of the pension; and in consideration of that promise I agreed to go to work for Jenkins Bros. on June 1, 1920."

"The amount of the pension referred to by Mr. Yardley was a maximum of $1500 a year and that would be paid me when I reached the age of 60 years; regardless of what happened in the meantime, if I were with the company or not, I would be given a credit for those 13 years of service with the maximum pension of $1500."

Later Lee put it this way:

"Mr. Farnham Yardley said that Jenkins would assume the obligation for my credit pension record with Crane Company and, if anything happened and they did not pay it, he would guarantee it himself."

"Mr. Yardley's words were 'regardless of what happens, you will get that pension if you join our company.'"

Finally, Lee summarized his position:

"My claim is that the company through the chairman of the board of directors and the president, promised me credit for my 13 years of service with Crane Company, regardless of what happened I would receive a pension at the age of 60, not to exceed $1,500 a year. If I was discharged in 1921 or 1922 or left I would still get that pension. That is what I am asking for."

This agreement was never reduced to writing.

Lee's prospects with Jenkins turned out to be just about as bright as he had hoped. He subsequently became vice president and general manager in charge of manufacturing and a director of the company. At that time he was receiving a salary of $25,000 from Jenkins, $8,000 more from an affiliate, plus an annual 10 per cent bonus. In 1945, however, after 25 years with Jenkins, Lee was discharged at the age of 55 and his pension rights under the company's established plan were settled in full.

In 1950 the payments under the alleged pension agreement became due. Although nothing was paid under this agreement Lee waited until 1955 to institute suit against Jenkins, joining Yardley eight and one-half months later.

The Crane Company pension plan prior to June 1, 1920, to which Lee said Yardley "referred," was a gratuitous or voluntary one whereby male employees could be retired by the company at 60 or apply for retirement at 65, if they had 25 years of service. Under the plan each employee would receive 2% of his salary for each year of service at retirement, with a maximum pension of $1500 a year. Lee admits it was a condition of eligibility under the Crane plan that the employee had to be in the employ of the company at the time of his retirement.

Although at the start of operations on June 1, 1920 Jenkins did not have a pension plan, it soon adopted one effective as of June 1, 1920 incorporating all the features of the Crane plan. The 350 former Crane employees, including Lee, who transferred over to Jenkins were all given credit under the Jenkins plan for service with the Crane Company. Lee, however, asserts that Yardley's promise was not fulfilled by the adoption of the Jenkins plan since he had been assured of pension payments "regardless of what happened." Moreover, although Jenkins revised its plan in 1932 and Lee voluntarily took coverage thereunder, all this he claims was "over and above" the rights promised by Yardley. Lee, a member of the pension committee, admits no other employee was given such pension rights.

Jurisdiction of these two actions is based on diversity of citizenship and

hence the United States District Court sitting in Connecticut was bound to apply Connecticut law including its conflicts principles, in resolving the issues involved.[2]

## I

The Evidence Is Not Sufficient to Support a Finding That Yardley Promised Lee a Pension That Did More Than Protect His Rights Under the Crane Pension Plan

■ Our conclusion that the jury should not have been permitted to pass upon this alleged issue has a double aspect. In the first place, taking Lee's version of what Yardley "said," and eliminating Lee's mental operations and interpretations of what he "thought" Yardley meant by what he said, and also eliminating Lee's erroneous recollection of what was written in the Crane plan "referred" to by Yardley and the formulation by Lee of his legal "claim," it is clear that Lee got exactly what Yardley promised him, i. e., "that Jenkins would assume the obligation for my credit pension record with Crane Company." In the second place, viewing the record before us as a whole, it is clear that Lee's "claim" is so far-fetched and absurd on its face as to make the submission of the "claim" to the jury a travesty on justice. There is no substance whatever to this "claim." The recent decision in Bird v. Connecticut Power Co., 1957, 144 Conn. 456, 133 A.2d 894, arrives at the same conclusion on a state of facts very similar to those in the case at bar.

Doubtless Lee was interested in protecting his "rights" under the Crane pension plan. Putting aside the gratuitous nature of this plan, we find through Lee's own testimony on cross-examination that the Crane plan had at least three conditions before payments would begin: (1) attainment of the age of 60; (2) 25 years of service with Crane; (3) employment with Crane at the time of retirement. It may be that Lee misun-

derstood the nature of his Crane pension "rights" in 1920 but that has no bearing on the case.

What Lee had accumulated was 13 years of service with Crane which was significant not only in meeting the 25-year service requirement but in computing the amount of the pension, which was based on a percentage of annual earnings and the length of service, subject to a $1500 maximum. Lee understandably did not want to lose any of the advantages he had earned by his long employment with Crane.

But he never requested or even thought of getting anything more than his Crane pension rights. Nor is any reason suggested why Yardley should have promised more than Lee requested. Yet Lee's whole claim is based on the premise that he received something more than he had been getting with Crane, particularly the elimination of the condition requiring employment at the time of retirement.

This "claim" is based entirely on Yardley's alleged promise to pay the pension "regardless of what happened." Lee interprets this phrase to mean the promise of something more than he asked. Actually the phrase is at most ambiguous and might easily refer to the uncertainty with respect to the subsequent adoption of the pension plan by Jenkins, or even to the possibility of disapproval of the agreement by other members of the board of directors. Whatever Yardley may have intended or Lee thought he meant by this phrase, it is clear that Lee has not established any meeting of the minds on the subject of whether or not he was to get the pension even if not employed by Jenkins when he reached the age of 60, a point not mentioned in the conversation with Yardley, and not in the contemplation of either of the participants in the conversation. See Maple Island Farm v. Bitterling, 8 Cir., 1954, 209 F.2d 867; Littell v. Evening Star Newspaper Co., 1941, 73 App.D.C. 409, 120 F.2d 36; Starr v. Superheater

2. Guaranty Trust Co. of New York v. York, 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231; Klax-

on Co. v. Stentor Electric Manufacturing Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477.

Co., 7 Cir., 1939, 102 F.2d 170; Horvath v. Sheridan-Wyoming Coal Co., 1942, 58 Wyo. 211, 131 P.2d 315.

In addition to the absence of any request by Lee or any negotiation on the subject of eliminating the condition of employment at the time of retirement, we note the following facts, all based on Lee's testimony, which indicate that nothing more than preservation of Lee's rights under the Crane plan was agreed upon. The oral agreement itself was highly indefinite unless the Crane plan was incorporated into it. Yet Lee would have us conclude that one of its most pertinent provisions was excluded without discussion. Moreover, no other pension arrangement like this one (as understood by Lee) was ever made. Instead, 350 other former Crane employees were credited for their Crane service under the Jenkins pension plan, which was in fact a duplicate of the Crane plan and similarly intended to protect prior pension "rights." Lee himself admits Yardley's intention was to "credit" him with his Crane service. When Jenkins instituted pension plans in 1920 and 1932 which covered Lee, the latter did nothing to clarify the situation or remind the company of any alleged additional obligation to him. Had there been any such obligation based solely on an oral agreement it is not conceivable that Lee would have remained silent about it for thirty years and for five years more, after his alleged additional pension rights became due, and finally assert them only when the sole other survivor of those participating in the conversation was blind and on the verge of death.

From this review of the proofs it is clear that Lee was promised his Crane pension rights but no more and that the proof of his "claim" on the alleged additional pension agreement was insufficient to raise any issue for the jury.

## II

### The Scope of Yardley's Authority

In the discussion which follows we assume, *arguendo*, that there was evidence sufficient to support a finding that Yardley orally agreed on behalf of the corporation that Lee would be paid at the age of 60 a pension not to exceed $1500, and that Yardley's words "regardless of what happens" were, as Lee contends, to be interpreted as meaning that Lee would receive this pension even if he were not working for Jenkins at the time the pension became payable. Jenkins asserts that Yardley had no authority to bind it to such an "extraordinary" contract, express, implied, or apparent and the trial court so found. There is nothing in the proofs submitted by Lee to warrant any finding of actual authority in Yardley. The Certificate of Incorporation and By-Laws of Jenkins are not in evidence nor was any course of conduct shown as between the corporation and Yardley. Accordingly, on the phase of the case now under discussion, we are dealing only with apparent authority. See 2 Fletcher, Cyclopedia Corporations, Section 449 (Perm.Ed.1954).

This brings us to a question of conflicts of law, to be decided under the law of Connecticut: is Yardley's authority to make the agreement on behalf of the corporation governed by the law of Connecticut, where the agreement was made and was to be performed, or by the law of New Jersey, where Jenkins was incorporated? As we have found no decision by the Connecticut courts on the point, we assume Connecticut will follow the general rule formulated in the Restatement of Conflicts, Sections 343–44 (1934). If we were dealing with actual authority, express or implied, the New Jersey law would be applicable. See Union & New Haven Trust Co. v. Watrous, 1929, 109 Conn. 268, 146 A. 727; Still v. Union Circulation Co., 2 Cir., 1939, 101 F.2d 11, certiorari denied, 308 U.S. 565, 60 S.Ct. 78, 84 L.Ed. 474; Abraham Lincoln Life Ins. Co. v. Hopwood, 6 Cir., 1936, 81 F.2d 284, certiorari denied, 298 U.S. 687, 56 S.Ct. 955, 80 L.Ed. 1406. But since we shall focus mainly on Yardley's apparent authority, the law of the place where Lee relied upon such apparent authority will control. Anthony P. Miller, Inc. v. Need-

364

ham, 3 Cir., 1941, 122 F.2d 710; Gallagher v. Washington County S. L. & B. Co., 1943, 125 W.Va. 791, 25 S.E.2d 914; cf. Thomas v. Matthiessen, 1914, 232 U. S. 221, 34 S.Ct. 312, 58 L.Ed. 577. See Reese and Kaufman, The Law Governing Corporate Affairs: Choice of Law and the Impact of Full Faith and Credit, 58 Colum.L.Rev. 1118, 1120 (1958).

■ The ascertainment of the Connecticut law on this critical question of Yardley's apparent authority is a far from simple task. The Connecticut cases have not yet quite come to grips with the question.[3] Hence, it is necessary to consult the "general" law on the subject, on the assumption that, if a general rule can be found, Connecticut would follow it.[4]

Any attempt to trace the development of the law in the area under discussion, and to distill out of the decisions rules of general application, will be mere futility, however, unless the factual background is first more closely examined. Lee's testimony concerning the words of the promise alleged to have been made by Yardley is explicit, as above set forth. We are concerned only with this promise, viewed against the background of attendant circumstance. Inferences and conclusions constituting the operation of Lee's mind, and thrown in helter-skelter

throughout his testimony, serve only to confuse the legal issues. What Lee said may present an issue of law or fact, but the operation of Lee's mind, what he said he "understood" the words to mean, or what his "claim" is, is relevant only to the issue of Lee's credibility. Thus he testified to his "understanding" that all he was required to do to entitle him to a pension for life at the age of 60, was to work for Jenkins for one week. Even if he voluntarily quit Jenkins' service thereafter, he tells us he would have earned his pension. Had Lee testified that Yardley said this and made a promise on behalf of the corporation to this effect, the promise would indeed be "extraordinary," and beyond any apparent authority of Yardley under the law of any American jurisdiction that has come to our notice.

As the promise as made, according to Lee's testimony, makes no provision for the time Lee is to work for Jenkins in order to qualify for the pension, we are faced with the question whether the promise is void for indefiniteness. Some courts might perhaps so hold,[5] but the weight of authority appears to favor the effectuation of the intent of the parties even though some aspects of the agreement are not fixed with precision.[6] Thus the law reads into the agreement an ob-

3. Cf. Terry Square Motors, Inc. v. Haber, 1951, 137 Conn. 377, 78 A.2d 337; Mutual Assur. Co. of City of Norwich v. Norwich Sav. Soc., 1942, 128 Conn. 510, 24 A.2d 477, 139 A.L.R. 829; Minotte E. Chatfield Co. v. Coffey Laundries, Inc., 1930, 111 Conn. 497, 150 A. 511; Safford v. Morris Metal Products Corp., 1922, 97 Conn. 650, 118 A. 37; Mercer v. Steil, 1922, 97 Conn. 583, 117 A. 689; Huber v. H. R. Douglas, Inc., 1919, 94 Conn. 167, 108 A. 727; Vincent v. S. Alexander's Sons Co., 1912, 85 Conn. 512, 84 A. 84; Taylor v. C. M. Robertson Co., 1912, 85 Conn. 504, 83 A. 534; Knapp v. Tidewater Coal Co., 1912, 85 Conn. 147, 81 A. 1063; Adams v. Herald Pub. Co., 1909, 82 Conn. 448, 74 A. 755; Mahoney v. Hartford Inv. Corp., 1909, 82 Conn. 280, 73 A. 766; New York B. & E. Ry. Co. v. Motil, 1908, 81 Conn. 466, 71 A. 563; Bowditch Furniture Co. v. Jones, 1901, 74 Conn. 149, 50 A. 41; Winsted Hosiery Co. v. New Britain Knitting Co., 1897, 69 Conn. 565, 38 A. 310; Fawcett

v. New Haven Organ Co., 1879, 47 Conn. 224; Swazey v. Union Mfg. Co., 1875, 42 Conn. 556; Perry v. Simpson Waterproof Mfg. Co., 1871, 37 Conn. 520; Stow v. Wyse, 1828, 7 Conn. 214.

4. See Eggers v. Armour & Co., 8 Cir., 1942, 129 F.2d 729; Abbott v. Arkansas Utilities Co., 8 Cir., 1948, 165 F.2d 339; cf. Lewis v. Minnesota Mut. Life Ins. Co., 1949, 240 Iowa 1249, 37 N.W.2d 316.

5. See Savarese v. Pyrene Mfg. Co., 1952, 9 N.J. 595, 89 A.2d 237; Lewis v. Minnesota Mut. Life Ins. Co., 1949, 240 Iowa 1249, 37 N.W.2d 316; Paisley v. Lucas, 1940, 346 Mo. 827, 143 S.W.2d 262.

6. Pierce v. Tennessee Coal, Iron & Railroad Co., 1899, 173 U.S. 1, 19 S.Ct. 335, 43 L.Ed. 591; Fibreboard Products, Inc. v. Townsend, 9 Cir., 1953, 202 F.2d 180; Baltimore & O. R. Co. v. Foar, 7 Cir., 1936, 84 F.2d 67; Pullman Co. v. Ray, 1953, 201 Md. 268, 94 A.2d 266; Horvath v. Sheridan-Wyoming Coal Co., 1942, 58

ligation on the part of Lee to work for Jenkins for a "reasonable" period of time, if he wished to qualify for the pension. Ordinarily this would be determined by a variety of attendant circumstances. We are not now called upon to make this appraisal as it is clear that Lee's twenty-five years of continuous employment with Jenkins was more than a "reasonable" period.

Our question on this phase of the case then boils itself down to the following: can it be said as a matter of law that Yardley as president, chairman of the board, substantial stockholder and trustee and son-in-law of the estate of the major stockholder, had no power in the presence of the company's most interested vice president to secure for a "reasonable" length of time badly needed key personnel by promising an experienced local executive a life pension to commence in 30 years at the age of 60, even if Lee were not then working for the corporation, when the maximum liability to Jenkins under such a pension was $1500 per year.

A survey of the law on the authority of corporate officers does not reveal a completely consistent pattern. For the most part the courts perhaps have taken a rather restrictive view on the extent of powers of corporate officials,[7] but the dissatisfaction with such an approach has been manifested in a variety of exceptions such as ratification,[8] estoppel,[9] and promissory estoppel.[10] See Note, 57 Colum.L.Rev. 868 (1957). For the most

part also there has been limited discussion of the problem of apparent authority, perhaps on the assumption that if authority could not be implied from a continuing course of action between the corporation and the officer, it could not have been apparent to third parties either.

Such an assumption is ill-founded. The circumstances and facts known to exist between officer and corporation, from which actual authority may be implied, may be entirely different from those circumstances known to exist as between the third party and the corporation. The two concepts are separate and distinct even though the state of the proofs in a given case may cause considerable overlap. Knapp v. Tidewater Coal Co., 1912, 85 Conn. 147, 81 A. 1063. See Restatement of Agency 2d, Sections 8, 27, 50 (1958); 2 Fletcher, Cyclopedia Corporations p. 346 (Perm.Ed.1954).

The rule most widely cited is that the president only has authority to bind his company by acts arising in the usual and regular course of business but not for contracts of an "extraordinary" nature.[11] The substance of such a rule lies in the content of the term "extraordinary" which is subject to a broad range of interpretation.

The growth and development of this rule occurred during the late nineteenth and early twentieth centuries when the potentialities of the corporate form of enterprise were just being realized.[12] As the corporation became a more common

Wyo. 211, 131 P.2d 315; Pennsylvania Co. v. Dolan, 1892, 6 Ind.App. 109, 32 N.E. 802.

7. 2 Fletcher, Cyclopedia Corporations, Section 466 (Perm.Ed.1954).

8. Pittsburgh, C. & St. L. Ry. v. Keokuk & Hamilton Bridge Co., 1889, 131 U.S. 371, 9 S.Ct. 770, 33 L.Ed. 157; Beall v. Morgantown & Kingwood R. Co., 1935, 116 W.Va. 515, 182 S.E. 295.

9. Mercer v. Steil, 1922, 97 Conn. 583, 117 A. 689; Usher v. New York Central & H. R. R. Co., 2 Dept. 1902, 76 App.Div. 422, 78 N.Y.S. 508, affirmed 1904, 179 N.Y. 544, 71 N.E. 1141.

10. Sessions v. Southern California Edison Co., 1941, 47 Cal.App.2d 611, 118 P.2d 935.

11. See Myrtle Ave. Corp. v. Mt. Prospect B. & L. Ass'n, Ct.Err. & App. 1934, 112 N.J.L. 60, 169 A. 707; Kline v. Thompson, 1932, 206 Wis. 464, 240 N.W. 128; Citizens' Bank v. Public Drug Co., 1921, 190 Iowa 983, 181 N.W. 274; Petition of Mulco Products, Super.Ct., 1956, 11 Terry 28, 50 Del. 28, 123 A.2d 95, affirmed Mulco Products, Inc. v. Black, 11 Terry 246, 50 Del. 246, 127 A.2d 851; Sacks v. Helene Curtis Industries, Inc., 1950, 340 Ill.App. 76, 91 N.E.2d 127.

12. See 2 Fletcher, Cyclopedia Corporations, Section 558 (Perm.Ed.1954).

vehicle for the conduct of business it became increasingly evident that many corporations, particularly small closely held ones, did not normally function in the formal ritualistic manner hitherto envisaged. While the boards of directors still nominally controlled corporate affairs, in reality officers and managers frequently ran the business with little, if any, board supervision. The natural consequence of such a development was that third parties commonly relied on the authority of such officials in almost all the multifarious transactions in which corporations engaged. The pace of modern business life was too swift to insist on the approval by the board of directors of every transaction that was in any way "unusual.".

The judicial recognition given to these developments has varied considerably. Whether termed "apparent authority" or an "estoppel" to deny authority, many courts have noted the injustice caused by the practice of permitting corporations to act commonly through their executives and then allowing them to disclaim an agreement as beyond the authority of the contracting officer, when the contract no longer suited its convenience.[13] Other courts, however, continued to cling to the past with little attempt to discuss the unconscionable results obtained or the doctrine of apparent authority.[14] Such restrictive views have been generally condemned by the commentators.[15]

The summary of holdings pro and con in general on the subject of what are and what are not "extraordinary" agreements is inconclusive at best, as shown by the authorities collected in the footnote.[16] But the pattern becomes more distinct when we turn to the more limited area of employment contracts.

13. F. S. Royster Guano Co. v. Hall, 4 Cir., 1934, 68 F.2d 533; Eggers v. Armour & Co., 8 Cir., 1942, 129 F.2d 729; Baltimore & O. R. Co. v. Foar, 7 Cir., 1936, 84 F.2d 67; St. Clair v. Rutledge, 1902, 115 Wis. 583, 92 N.W. 234; Citizens' Bank v. Public Drug Co., 1921, 190 Iowa 983, 181 N.W. 274, cf. Mutual Assur. Co. of City of Norwich v. Norwich Sav. Soc., 1942, 128 Conn. 510, 24 A.2d 477, 139 A.L.R. 829.

14. See Sacks v. Helene Curtis Industries, Inc., 1950, 340 Ill.App. 76, 91 N.E.2d 127; Noyes v. Irving Trust Co., 1 Dept. 1937, 250 App.Div. 274, 294 N.Y.S. 2, affirmed without opinion, 275 N.Y. 520, 11 N.E.2d 323; Warszawa v. White Eagle Brewing Co., 1939, 299 Ill.App. 509, 20 N.E.2d 343; Pullman Co. v. Ray, 1953, 201 Md. 268, 94 A.2d 266; Pedicord v. Elm Grove Mining Co., 1931, 110 W.Va. 116, 157 S.E. 89.

15. See 2 Fletcher, Cyclopedia Corporations p. 627 (Perm.Ed.1954); Stevens, Corporations pp. 771–73 (2d Ed.1949); Note, 57 Colum.Law Rev. 868, 885–86 (1957); Note, 17 B'klyn L.Rev. 310, 316–17 (1951). Cf. 1 Mecham, Agency p. 707 (2d Ed.1914).

16. We note that the following acts have been held to be within either the implied or apparent authority of a corporate president or manager: borrowing money and executing a corporate note, Petition of Mulco Products, Super.Ct., 1956, 11 Terry 28, 50 Del. 28, 123 A.2d 95, affirmed Mulco Products, Inc. v. Black, 11 Terry 246, 50 Del. 246, 127 A. 2d 851; Shircliff v. Dixie Drive-in Theatre, 1955, 7 Ill.App.2d 370, 129 N.E.2d 346; Kraft v. Freeman Printing & Publishing Ass'n, 1881, 87 N.Y. 628; even though the moneys obtained might not be used for the benefit of the corporation, Chestnut St. Trust & Savings Fund Co. v. Record Pub. Co., 1910, 227 Pa. 235, 75 A. 1037; pledging security for a loan, Williams v. Hall, 1926, 30 Ariz. 581, 249 P. 755; guaranteeing the note of another corporation, Allis-Chalmers Mfg. Co. v. Citizens Bank & Trust Co., D.C.D.Idaho, 1924, 3 F.2d 316; purchasing merchandise, Blackstone Theatre Corporation v. Goldwyn Distributing Corp., 1925, 86 Ind. App. 277, 146 N.E. 217; White v. Elgin Creamery Co., 1899, 108 Iowa 522, 79 N.W. 283; authorizing an attorney to sue on a corporate claim, Elblum Holding Corp. v. Mintz, 1938, 120 N.J.L. 604, 1 A.2d 204; compromising a corporate claim, Fair Mercantile Co. v. Union-May-Stern Co., 1949, 359 Mo. 385, 221 S.W. 2d 751; making a tax closing agreement, E. Van Noorden & Co. v. United States, D.C.D.Mass.1934, 8 F.Supp. 279; executing a time limitations waiver, Philip Carey Mfg. Co. v. Dean, 6 Cir., 1932, 58 F.2d 737, certiorari denied, 287 U.S. 623, 53 S.Ct. 78, 77 L.Ed. 541; St. Clair v. Rutledge, 1902, 115 Wis. 583, 92 N.W. 234; pledging a substantial contribution to a hospital, Memorial Hospital Ass'n of Stanislaus County v. Pacific Grape Products Co., 1955, 45 Cal.2d 634, 290

■ It is generally settled that the president as part of the regular course of business has authority to hire and discharge employees and fix their compensation.[17] In so doing he may agree to hire them for a specific number of years if the term selected is deemed reasonable.[18] But employment contracts for life or on a "permanent" basis are generally regarded as "extraordinary" and beyond the authority of any corporate executive if the only consideration for the promise is the employee's promise to work for that period.[19] Jenkins would have us analogize the pension agreement involved herein to these generally condemned lifetime employment contracts because it extends over a long period of time, is of

P.2d 481, 50 A.L.R.2d 442; licensing a factory spur track, Anglim v. Sears-Roebuck Shoe Factories, 1926, 255 Mass. 334, 151 N.E. 313; sale of the corporation's only property, Jeppi v. Brockman Holding Co., 1949, 34 Cal.2d 11, 206 P.2d 847, 9 A.L.R.2d 1299; of all its merchandise and fixtures, Magowan v. Groneweg, 1902, 16 S.D. 29, 91 N.W. 335; or its real estate, Domestic Bldg. Ass'n v. Guadiano, 1902, 195 Ill. 222, 63 N.E. 98.

Other courts have left the question to the jury when the matter involved was: execution of a corporate note, Citizens' Bank v. Public Drug Co., 1921, 190 Iowa 983, 181 N.W. 274; a promise of additional service, Wichita Falls Electric Co. v. Huey, Tex.Civ.App.1923, 246 S.W. 692; a promise to pay a stale debt, Renault v. L. N. Renault & Sons, Inc., 3 Cir., 1951, 188 F.2d 317; entering a joint venture, Lane v. National Ins. Agency, 1934, 148 Or. 589, 37 P.2d 365; oral waiver of written contract provisions, Van Dusen Aircraft Supplies v. Terminal Construction Corp., 1949, 3 N.J. 321, 70 A.2d 65, and sale of the corporation's sole asset, C. B. Snyder Realty Co. v. National Newark & Essex Banking Co., 1953, 14 N.J. 146, 101 A.2d 544.

On the other hand authority has been found lacking in the following instances: sale of all the company's assets or its major asset, Winsted Hosiery Co. v. New Britain Knitting Co., 1897, 69 Conn. 565, 38 A. 310; Plant v. White River Lumber Co., 8 Cir., 1935, 76 F.2d 155; Gabriel v. Auf Der-Heide-Aragona, Inc., 1951, 14 N.J.Super. 558, 82 A.2d 644; a brokerage contract to effectuate a merger, Abraham Lincoln Life Ins. Co. v. Hopwood, 6 Cir., 1936, 81 F.2d 284, certiorari denied, 298 U.S. 687, 56 S. Ct. 955, 80 L.Ed. 1406; modification of directors' resolutions, McMillan v. Dozier, 1952, 257 Ala. 435, 59 So.2d 563; Miller v. Wick Bldg. Co., 1950, 154 Ohio St. 93, 93 N.E.2d 467; Foley v. Wabasha-Nelson Bridge Co., 1940, 207 Minn. 399, 291 N.W. 903; Sattler v. Howe Rubber Corp., Ct.Err. & App.1923, 98 N.J.L. 460, 121 A. 523; employing an architect in a major construction project, Colish v. Brandywine Raceway Ass'n, Inc., Super. Ct., 1955, 10 Terry 493, 49 Del. 493, 119 A.2d 887; giving away corporate property, Fawcett v. New Haven Organ Co., 1879, 47 Conn. 224; Sayre Land Co. v. Borough of Sayre, 1956, 384 Pa. 534, 121 A.2d 579; postponing a mortgage foreclosure, Myrtle Ave. Corp. v. Mt. Prospect B. & L. Ass'n, Ct.Err. & App., 1934, 112 N.J.L. 60, 169 A. 707; suing the corporation's chief stockholder, Ney v. Eastern Iowa Telephone Co., 1913, 162 Iowa 525, 144 N.W. 383; guaranteeing the debt of another, First National Bank of Mason City v. Cement Products Co., 1929, 209 Iowa 358, 227 N.W. 908; and contracts deemed unconscionable from the corporation's point of view, Bowditch, Furniture Co. v. Jones, 1901, 74 Conn. 149, 50 A. 41; Schwartz v. United Merchants & Manufacturers, 2 Cir., 1934, 72 F.2d 256; Bassick v. Aetna Explosives Co., D.C.S.D.N.Y.1917, 246 F. 974.

17. See Vincent v. S. Alexander's Sons Co., 1912, 85 Conn. 512, 84 A. 84; 2 Fletcher, Cyclopedia Corporations p. 444 (Perm. Ed.1954).

18. Safford v. Morris Metal Products Corp., 1922, 97 Conn. 650, 118 A. 37; Perry v. Simpson Waterproof Mfg. Co., 1871, 37 Conn. 520; United Producers and Consumers Co-operative v. Held, 9 Cir., 1955, 225 F.2d 615; Edwards v. Plains Light & Water Co., 1914, 49 Mont. 535, 143 P. 962; Model Clothing House v. Hirsch, 1908, 42 Ind.App. 270, 85 N.E. 719.
    Contra: Edwards v. Keller, Tex.Civ. App.1939, 133 S.W.2d 823; Pedicord v. Elm Grove Mining Co., 1931, 110 W.Va. 116, 157 S.E. 89.

19. Maple Island Farm, Inc. v. Bitterling, 8 Cir., 1954, 209 F.2d 867, certiorari denied, 348 U.S. 882, 75 S.Ct. 123, 99 L. Ed. 722; Chesapeake & Potomac Telephone Co. of Baltimore City v. Murray, 1951, 198 Md. 526, 84 A.2d 870; Horvath v. Sheridan-Wyoming Coal Co., 1942, 58 Wyo. 211, 131 P.2d 315; Heaman v. E. N. Rowell Co., 1933, 261 N.Y. 229, 185 N.E. 83; Carney v. New York Life Ins. Co., 1900, 162 N.Y. 453, 57 N.E. 78, 49 L.R.A. 471.

indefinite duration, and involves an indefinite liability on the part of the corporation.

It is not surprising that lifetime employment contracts have met with substantial hostility in the courts, for these contracts are often oral, uncorroborated, vague in important details and highly improbable. Accordingly, the courts have erected a veritable array of obstacles to their enforcement. They have been construed as terminable at will,[20] too indefinite to enforce,[21] *ultra vires*,[22] lacking in mutuality or consideration,[23] abandoned or breached by subsequent acts,[24] and the supporting evidence deemed insufficient to go to the jury,[25] as well as made without proper authority.

However, at times such contracts have been enforced where the circumstances tended to support the plausibility of plaintiff's testimony. Thus when the plaintiff was injured in the course of employment and he agreed to settle his claim of negligence against the company for a lifetime job, authority has been generally found [26] and the barrage of other objections adequately disposed of.[27] And where additional consideration was given such as quitting other employment, giving up a competing business, or where the services were "peculiarly necessary" to the corporation, the courts have divided on the enforceability of the contract.[28]

What makes the point now under discussion particularly interesting is the failure of the courts denying authority to make lifetime contracts to evolve any guiding principle. More often than not

20. Littell v. Evening Star Newspaper Co., 1941, 73 App.D.C. 409, 120 F.2d 36; Heideman v. Tall's Travel Shops, Inc., 1937, 192 Wash. 513, 73 P.2d 1323; Skagerberg v. Blandin Paper Co., 1936, 197 Minn. 291, 266 N.W. 872; Arentz v. Morse Dry Dock & Repair Co., 1928, 249 N.Y. 439, 164 N.E. 342, 62 A.L.R. 231; Rape v. Mobile & O. R. Co., 1924, 136 Miss. 38, 100 So. 585, 35 A.L.R. 1422.

21. Lewis v. Minnesota Mut. Life Ins. Co., 1949, 240 Iowa 1249, 37 N.W.2d 316; Gensman v. West Coast Power Co., 1940, 3 Wash.2d 404, 101 P.2d 316; Paisley v. Lucas, 1940, 346 Mo. 827, 143 S.W. 2d 262.

22. Rasmick v. W. M. Ritter Lumber Co., 1920, 187 Ky. 523, 219 S.W. 801; Beaton v. Continental Southland S. & L. Ass'n, Tex.Civ.App., 1937, 101 S.W.2d 905.

23. Lewis v. Minnesota Mut. Life Ins. Co., 1949, 240 Iowa 1249, 37 N.W.2d 316; Clifford v. Firemen's Mut. Benevolent Ass'n, 2 Dept. 1931, 232 App.Div. 260, 249 N.Y.S. 713, affirmed without opinion, 1932, 259 N.Y. 547, 182 N.E. 175; Minter v. Tootle-Campbell Dry Goods Co., 1915, 187 Mo.App. 16, 173 S.W. 4; Beers v. New York Life Ins. Co., Sup.Ct., 1892, 66 Hun 75, 20 N.Y.S. 788.

24. Starr v. Superheater Co., 7 Cir., 1939, 102 F.2d 170; Beall v. Morgantown & Kingwood R. Co., 1937, 118 W.Va. 289, 190 S.E. 333; see Leak v. Halaby Galleries, Inc., Tex.Civ.App., 1932, 49 S.W.

2d 858, 859; Cf. Sattler v. Howe Rubber Corp., Ct.Err. & App.1923, 98 N.J.L. 460, 121 A. 523.

25. Littell v. Evening Star Newspaper Co., 1941, 73 App.D.C. 409, 120 F.2d 36; Starr v. Superheater Co., 7 Cir., 1939, 102 F.2d 170; see Horvath v. Sheridan-Wyoming Coal Co., 1942, 58 Wyo. 211, 131 P.2d 315.

26. F. S. Royster Guano Co. v. Hall, 4 Cir., 1934, 68 F.2d 533; Louisville & N. R. Co. v. Cox, 1911, 145 Ky. 667, 141 S.W. 389; Stearns v. Lake Shore & M. S. Ry. Co., 1897, 112 Mich. 651, 71 N.W. 148; see Usher v. New York Central & H. R. R. Co., 2 Dept. 1902, 76 App.Div. 422, 78 N.Y.S. 508, affirmed 1904, 179 N.Y. 544, 71 N.E. 1141; cf. Eggers v. Armour & Co., 8 Cir., 1942, 129 F.2d 729.

Contra: Pullman Co. v. Ray, 1953, 201 Md. 268, 94 A.2d 266; Seiss v. McClintic-Marshall Corp., 1936, 324 Pa. 201, 188 A. 109; see Maxson v. Michigan Cent. R. Co., 1898, 117 Mich. 218, 75 N.W. 459.

27. Pierce v. Tennessee Coal, Iron & Railroad Co., 1899, 173 U.S. 1, 19 S.Ct. 335, 43 L.Ed. 591; Pennsylvania Co. v. Dolan, 1892, 6 Ind.App. 109, 32 N.E. 802.

28. Compare: Baltimore & O. R. Co. v. Foar, 7 Cir., 1936, 84 F.2d 67; Fletcher v. Agar Mfg. Corp., D.C.W.D.Mo.1942, 45 F.Supp. 650; General Paint Corp. v. Kramer, 10 Cir., 1932, 57 F.2d 698, 703 (Dictum), certiorari denied, 287 U.S. 605, 53 S.Ct. 10, 77 L.Ed. 526; see Abbott v. Arkansas Utilities Co., 8 Cir., 1948, 165 F.2d 339; Riefkin v. E. I.

we find a mere statement that the contract is "extraordinary" with a citation of cases which say the same thing,[29] without giving reasons. And even in some of the leading cases the question of apparent authority is not even mentioned.[30] All this is a not uncommon indication that the law in a particular area is in a state of evolution, and there seems every reason to believe that the law affecting numerous features of employer-employee relationship, is far from static.

Where reasons have been given to support the conclusion that lifetime employments are "extraordinary," and hence made without authority, a scrutiny of these reasons may be helpful for their bearing on the analogous field of pension agreements. It is said that: they unduly restrict the power of the shareholders and future boards of directors on questions of managerial policy;[31] they subject the corporation to an inordinately substantial amount of liability;[32] they run for long and indefinite periods of time.[33] Of these reasons the only one applicable to pension agreements is that they run for long and indefinite periods of time. There the likeness stops. Future director or shareholder control is in no way impeded; the amount of liability is not disproportionate; the agreement was not only not unreasonable but beneficial and necessary to the corporation; and pension contracts are commonly used fringe benefits in employment contracts. Moreover, unlike the case with life employment contracts, courts have often gone out of their way to find pension promises binding and definite even when labeled gratuitous by the em-

Du Pont de Nemours & Co., 1923, 53 App.D.C. 311, 290 F. 286; Carnig v. Carr, 1897, 167 Mass. 544, 46 N.E. 117; Elwell v. State Mut. Life Assur. Co., 1918, 230 Mass. 248, 119 N.E. 794; cf. Perry v. Simpson Waterproof Mfg. Co., 1871, 37 Conn. 520.

With: Harrison v. Commander Mills, Inc., Okl.1956, 298 P.2d 749; Savarese v. Pyrene Mfg. Co., 1952, 9 N.J. 595, 89 A.2d 237; Chesapeake & Potomac Telephone Co. of Baltimore City v. Murray, 1951, 198 Md. 526, 84 A.2d 870; Heideman v. Tall's Travel Shops, Inc., 1937, 192 Wash. 513, 73 P.2d 1323; see Skagerberg v. Blandin Paper Co., 1936, 197 Minn. 291, 266 N.W. 872; Rape v. Mobile & O. R. Co., 1924, 136 Miss. 38, 100 So. 585, 35 A.L.R. 1422; Minter v. Tootle-Campbell Dry Goods Co., 1915, 187 Mo.App. 16, 173 S.W. 4.

29. Harrison v. Commander Mills, Inc., Okl. 1956, 298 P.2d 749; Lewis v. Minnesota Mut. Life Ins. Co., 1949, 240 Iowa 1249, 37 N.W.2d 316; Seiss v. McClintic-Marshall Corp., 1936, 324 Pa. 201, 188 A. 109; Beall v. Morgantown & Kingwood R. Co., 1935, 116 W.Va. 515, 182 S.E. 295.

30. E. g., General Paint Corp. v. Kramer, 10 Cir., 1932, 57 F.2d 698, certiorari denied, 287 U.S. 605, 53 S.Ct. 10, 77 L. Ed. 526; Harrison v. Commander Mills, Inc., Okl.1956, 298 P.2d 749; Pullman Co. v. Ray, 1953, 201 Md. 268, 94 A.2d 266; Savarese v. Pyrene Mfg. Co., 1952,

9 N.J. 595, 89 A.2d 237; Chesapeake & Potomac Telephone Co. of Baltimore City v. Murray, 1951, 198 Md. 526, 84 A.2d 870; Heaman v. E. N. Rowell Co., 1933, 261 N.Y. 229, 185 N.E. 83; Carney v. New York Life Ins. Co., 1900, 162 N.Y. 453, 57 N.E. 78, 49 L.R.A. 471.

31. General Paint Corp. v. Kramer, 10 Cir., 1932, 57 F.2d 698, 703, certiorari denied, 287 U.S. 605, 53 S.Ct. 10, 77 L. Ed. 526; Pullman Co. v. Ray, 1953, 201 Md. 268, 94 A.2d 266; Chesapeake & Potomac Telephone Co. of Baltimore City v. Murray, 1951, 198 Md. 526, 84 A.2d 870; Carney v. New York Life Ins. Co., 1900, 162 N.Y. 453, 57 N.E. 78, 49 L.R.A. 471; Greaves v. American Institute for Scientific Research, Sup.Ct., 1921, 114 Misc. 413, 187 N.Y.S. 420; Beers v. New York Life Ins. Co., Sup. Ct., 1892, 66 Hun 75, 20 N.Y.S. 788.

32. See Maple Island Farm, Inc. v. Bitterling, 8 Cir., 1954, 209 F.2d 867, 878, certiorari denied, 348 U.S. 882, 75 S.Ct. 123, 99 L.Ed. 722; Plant v. White River Lumber Co., 8 Cir., 1935, 76 F.2d 155, 158–159; Carney v. New York Life Ins. Co., 1900, 162 N.Y. 453, 57 N.E. 78, 49 A.L.R. 471.

33. See Savarese v. Pyrene Mfg. Co., 1952, 9 N.J. 595, 89 A.2d 237; Plant v. White River Lumber Co., 8 Cir., 1935, 76 F. 2d 155, 158–159; Rape v. Mobile & O. R. Co., 1924, 136 Miss. 38, 100 So. 585, 587, 35 A.L.R. 1422.

ployer.[34] The consideration given to the employee involved is not at all dependent on profits or sales, nor does it involve some other variable suggesting director discretion.[35]

In this case Lee was hired at a starting salary of $4,000 per year plus a contemplated pension of $1500 per year in thirty years. Had Lee been hired at a starting salary of $10,000 per year the cost to the corporation over the long run would have been substantially greater, yet no one could plausibly contend that such an employment contract was beyond Yardley's authority.

The cases on executive authority to make pension agreements are few. In West v. Hunt Foods, Inc., 1951, 101 Cal. App.2d 597, 225 P.2d 978, the most recent case on the subject, a nonsuit was reversed on the theory that the jury might have decided in plaintiff's favor either upon the basis of authority in the president and vice-president to make the promise of a pension or on the basis of a promissory estoppel.[36] In Langer v. Superior Steel Corp., 1935, 318 Pa. 490, 178 A. 490, authority was found lacking in the president, who acted in direct violation of a directors' resolution, to promise a pension for life in return for past services. His apparent authority was not discussed. In Plowman v. Indian Refining Co., D.C.E.D.Ill.1937, 20 F.Supp. 1, the vice president was found to lack authority gratuitously to promise 18 employees life pensions at half wages. In

Rennie v. Mutual Life Ins. Co., 1 Cir., 1910, 176 F. 202, plaintiff orally was promised in 1886 by the defendant's president that if plaintiff would go to Australia to act as general manager and "if, on the termination of his employment as said general manager, the plaintiff had not succeeded in building up a satisfactory renewal commission account, the defendant would pay to him annually for the remainder of his life an amount sufficient to support him." The case seems distinguishable on its facts and in the setting of 1886 would not seem particularly helpful today.

■ Apparent authority is essentially a question of fact.[37] It depends not only on the nature of the contract involved, but the officer negotiating it, the corporation's usual manner of conducting business, the size of the corporation and the number of its stockholders, the circumstances that give rise to the contract, the reasonableness of the contract, the amounts involved, and who the contracting third party is, to list a few but not all of the relevant factors. In certain instances a given contract may be so important to the welfare of the corporation that outsiders would naturally suppose that only the board of directors (or even the shareholders) could properly handle it. It is in this light that the "ordinary course of business" rule should be given its content. Beyond such "extraordinary" acts, whether or not apparent authority exists is simply a matter of fact.

34. See Chinn v. China National Aviation Corp., 1955, 138 Cal.App.2d 98, 291 P.2d 91; cf. Bullock v. Sterling Drug, Inc., D.C.E.D.Pa.1950, 93 F.Supp. 371, affirmed, 3 Cir., 1951, 187 F.2d 145; Hercules Powder Co. v. Brookfield, 1949, 189 Va. 531, 53 S.E.2d 804; Mabley & Carew Co. v. Borden, 1935, 129 Ohio St. 375, 195 N.E. 697.

35. Sacks v. Helene Curtis Industries, Inc., 1950, 340 Ill.App. 76, 91 N.E.2d 127; Warszawa v. White Eagle Brewing Co., 1939, 299 Ill.App. 509, 20 N.E.2d 343; Noyes v. Irving Trust Co., 1 Dept. 1937, 250 App.Div. 274, 294 N.Y.S. 2, affirmed without opinion, 275 N.Y. 520, 11 N.E.2d 323. But see Jaffe v. Chicago Warehouse Lumber Co., 1954, 4 Ill.App.2d 415, 124 N.E.2d 618.

36. Cf. Sessions v. Southern California Edison Co., 1941, 47 Cal.App.2d 611, 118 P. 2d 935.

37. Adams v. Herald Pub. Co., 1909, 82 Conn. 448, 74 A. 755; Swazey v. Union Mfg. Co., 1875, 42 Conn. 556; Baltimore & O. R. Co. v. Foar, 7 Cir., 1936, 84 F. 2d 67; Fletcher v. Agar Mfg. Corp., D.C.W.D.Mo.1942, 45 F.Supp. 650; Louisville & N. R. Co. v. Cox, 1911, 145 Ky. 667, 141 S.W. 389; 2 Fletcher, Cyclopedia Corporations, Section 488 (Perm.Ed.1954); but see Carney v. New York Life Ins. Co., 1900, 162 N.Y. 453, 57 N.E. 78, 49 L.R.A. 471; Winsted Hosiery Co. v. New Britain Knitting Co., 1897, 69 Conn. 565, 38 A. 310.

■ Accordingly, we hold that, assuming there was sufficient proof of the making of the pension agreement, Connecticut, in the particular circumstances of this case, would probably take the view that reasonable men could differ on the subject of whether or not Yardley had apparent authority to make the contract, and that the trial court erred in deciding the question as a matter of law. We do not think Connecticut would adopt any hard and fast rule against apparent authority to make pension agreements generally, on the theory that they were in the same category as lifetime employment contracts.

### III

### The Applicability of the Statute of Frauds

The primary basis for the trial court's dismissal of Lee's claim against both Yardley and Jenkins is the Connecticut Statute of Frauds. Conn.Gen.Stat. Section 8293 (1949) provides:

"No civil action shall be maintained * * * against any person upon any special promise to answer for the debt, default or miscarriage of another * * * or upon any agreement that is not to be performed within one year from the making thereof, unless such agreement, or some memorandum thereof, be made in writing, and signed by the party to be charged therewith, or his agent; * * *"

At the outset it must be recognized that this seems like the ideal situation to invoke the Statute of Frauds. The contract was oral although one would normally expect written evidence of such an agreement. With the exception of Lee, all the witnesses to the conversation are dead. The conversation occurred almost 40 years ago, and as "understood" by Lee is extremely improbable. Moreover, during this entire stretch of years Lee not once, orally or in writing, asserted the existence of the alleged agreement.

■ With respect to Yardley, his promise to guarantee payment of the pension by Jenkins seems clearly to be a contract of suretyship and hence expressly prohibited by the Connecticut Statute of Frauds. Fitzsimmons v. International Ass'n of Machinists, 1939, 125 Conn. 490, 7 A.2d 448; Warner v. Willoughby, 1891, 60 Conn. 468, 22 A. 1014. See 2 Corbin, Contracts Section 347 (1950); 2 Williston, Contracts Sections 452–54 (Rev.Ed.1936). There is nothing in Lee's own testimony from which it could be inferred that Yardley's promise was a primary obligation as in Sadd v. Siegelbaum, 1938, 124 Conn. 383, 200 A. 346; Bartolotta v. Calvo, 1930, 112 Conn. 385, 152 A. 306.

■ A more serious question would be posed, however, if Jenkins were found not to be liable because Yardley lacked authority to make the primary promise on its behalf. In that event there would not be a valid underlying obligation and the general rule in such a case is to find the Statute inapplicable because there is no "debt, default or miscarriage of another" which Yardley's promise could have guaranteed. See Meinrath Brokerage Co. v. Collins-Dietz-Morris Co., 8 Cir., 1924, 298 F. 377; Delaware Feed Stores v. First Auburn Trust Co., 1956, 151 Me. 372, 120 A.2d 223; Duca v. Lord, 1954, 331 Mass. 51, 117 N.E.2d 145; Dodge's Market v. Turner, D.C. Mun.Ct.App., 1949, 67 A.2d 526; Samuels Bros. v. Falwell, 1933, 215 Iowa 650, 246 N.W. 657; Fischer v. Bashwitz, 1931, 152 Okl. 231, 5 P.2d 356; Kleinpeter v. Connell, 1929, 10 La.App. 567, 121 So. 635; Restatement of Contracts, Section 180, Comment b (1932); 2 Williston, Contracts Section 454 (1936). But in this case both Lee and Yardley assumed that a valid obligation did exist at the time Yardley purported to make his guarantee. If such assumption is contrary to fact, it would require a litigation almost 40 years from the time it was made to prove that there was no such underlying obligation. Yet all the reasons for enforcing the Statute seem plainly present. See Davis v. Patrick, 1891, 141 U.S. 479, 487–488, 12 S.Ct. 58, 35 L.Ed. 826; Maule v. Bucknell, 1865,

50 Pa. 39; 2 Corbin, Contracts p. 3 (1950); 2 Williston, Contracts p. 1314 (Rev.Ed.1936). Both parties realized, or should have realized, that the nature of the contract would suggest that the agreement be put in writing. If the aim of the Statute, in addition to the curtailment of fraud, is to insure a sufficient seriousness of intent on the part of the promisor, then as far as the parties were concerned, this need was equally imperative here. If it be thought desirable to require a writing from a promisor receiving little personal benefit from the primary transaction in order to insure that his obligation is not unduly expanded by faulty memory, the purport of the Statute is here equally controlling.

The cases which have required a valid underlying obligation to apply the Statute of Frauds have generally dealt with instances where the promisor did not believe a valid debt to a third party was actually in existence. Frequently, it was expected that the third party would become liable *in futuro*. E. g., Delaware Feed Stores v. First Auburn Trust Co., supra; Duca v. Lord, supra; Samuels Bros. v. Falwell, supra; Brown v. Churchill, 1938, 89 N.H. 441, 200 A. 393; Ingraham v. Strong, 1891, 41 Ill.App. 46; Ledlow v. Becton, 1860, 36 Ala. 596; Walker v. Norton, 1857, 29 Vt. 226; Mease v. Wagner, 1821, 1 McCord (S.C.) 395. Sometimes the promisee relied solely on the defendant's promise. Reed v. Holcomb, 1863, 31 Conn. 360; Peabody v. Harvey, 1821, 4 Conn. 119; Meinrath Brokerage Co. v. Collins-Dietz-Morris Co., supra; Moate v. H. L. Green Co., 1957, 95 Ga.App. 493, 98 S.E.2d 185. On occasion the promisor's representation of authority was fraudulent. Voris v. Star City B. & L. Ass'n, 1898, 20 Ind.App. 630, 50 N.E. 779.

Certainly when the promisor is aware that he has no actual authority to bind the third party it would be inequitable to permit him to claim that a writing is required because he was to answer for "the debt, default or miscarriage of another." For he is acting just as independently as if the credit of the third party were not even contemplated. But where in fact both parties believe in good faith that the third party is currently liable, it makes little sense not to treat them for the purposes of the Statute of Frauds in the same posture as they bargained. To predicate the application of the Statute on a condition, the existence of which neither suspected and which was only found to exist forty years later, seems to play fast and loose with the basic purposes of the Statute.

▬ It is to be noted that a voidable underlying obligation is usually deemed sufficient to qualify as a primary debt to render the collateral promise within the Statute of Frauds. Brown v. Farmers' & Merchants' Nat. Bank, 1895, 88 Tex. 265, 31 S.W. 285, 33 L.R.A. 359; Baker v. Morris, 1885, 33 Kan. 580, 7 P. 267; Scott v. Bryan, 1875, 73 N.C. 582; Dexter v. Blanchard, 1865, 11 Allen 365, 93 Mass. 365; Baldwin v. Hiers, 1884, 73 Ga. 739, 740 (dictum). See 2 Corbin, Contracts Section 356 (1950); 2 Williston, Contracts p. 1318 (Rev.Ed.1936). But see King v. Summitt, 1881, 73 Ind. 312. We think it not unreasonable to apply the same rule to ratifiable primary obligations, especially where both parties thought the underlying debt valid to begin with. While the authority on this precise point is meager—see Simons Brick Co. v. Wiglesworth, 1920, 184 Cal. 390, 193 P. 947, 19 A.L.R. 1029; cf. Hooker v. Russell, 1886, 67 Wis. 257, 30 N.W. 358; Crowley v. Whittemore, 1926, 255 Mass. 99, 150 N.E. 880; Durant v. Allen, 1875, 48 Vt. 58; but see 2 Corbin, Contracts p. 220 (1950)—we think this approach is sound in principle and that the Connecticut courts will adopt it. Hence, Lee's claim against Yardley is barred by the Statute of Frauds whether or not Yardley had authority to bind Jenkins.

The trial court also found that both Yardley and Jenkins were insulated by the provision in the Connecticut Statute of Frauds requiring agreements "not to be performed within one year from the making thereof" to be in writing. Lee,

however, maintains there are several reasons why the statute is inapplicable.

First, it is contended that the agreement herein was a "unilateral contract," and hence not within the scope of the Statute of Frauds. However, according to Lee's own version, prior to June 1, 1920, he "agreed to go to work for Jenkins Brothers" (and we have inferred for a reasonable period of time), and to quit his job with Crane Company. Such an exchange of promises constituted a bilateral contract. See 1 Williston, Contracts Section 13 (Rev.Ed.1936); 1 Restatement, Contracts Section 12 (1932).

Second, for this purpose Lee likens the pension agreement to contracts of employment for personal services of indefinite duration which because terminable by death within a year are deemed to be not within the Statute of Frauds. In this case, however, the time for performance was fixed to begin at a time 30 years in the future. While Lee's death would have terminated the contract, it would not have constituted performance by Jenkins. Termination is not performance and the Statute of Frauds speaks only in terms of "performance." See Burkle v. Superflow Mfg. Co., 1950, 137 Conn. 488, 78 A.2d 698.

Lee also contends, however, that he has fully performed his part of the agreement and thus the requirement of the Statute of Frauds that agreements "not to be performed within one year from the making thereof" be in writing is not applicable. This is the rule in the majority of jurisdictions in this country, 2 Williston, Contracts p. 1471 (Rev.Ed. 1936) and is accepted in Connecticut. Stanley v. M. H. Rhodes, Inc., 1954, 140 Conn. 689, 103 A.2d 143; Strang v. Witkowski, 1951, 138 Conn. 94, 82 A.2d 624; Blakeslee v. Board of Water Commissioners, 1936, 121 Conn. 163, 183 A. 887; Stueck v. G. C. Murphy Co., 1928, 107 Conn. 656, 142 A. 301; Haussman v. Burnham, 1890, 59 Conn. 117, 22 A. 1065; Hayden v. Denslow, 1858, 27 Conn. 335.

The trial court concluded that this full performance doctrine was limited to those situations where the conduct of the parties is "unintelligible or at least extraordinary" unless related to the contract. Such is not the case here as it would have seemed the most natural thing imaginable for Lee to go to Jenkins with the other 350 Crane employees, without any promise of a pension. This would mean staying in his home town with an important and growing manufacturing company and with excellent prospects of advancement.

However, we do not read the decisions of the Connecticut courts as so circumscribing the full performance rule, which appears to be based upon the manifest injustice of applying the Statute of Frauds against a person who has fully performed his part of the agreement. 2 Corbin, Contracts Section 458 (1950); 2 Williston, Contracts Section 504 (Rev.Ed. 1936); Restatement, Contract Section 198 (1932).

The trial court was apparently misled by the "part performance" exception to the provision of the Statute of Frauds requiring a writing "upon any agreement for the sale of real estate or any interest in or concerning it." Here, the Connecticut courts have quite specifically indicated that to take an agreement out of the Statute the part performance must be "reasonably accounted for in no other way" than by the existence of some contract in relation to the subject matter in dispute. See Rutt v. Roche, 1952, 138 Conn. 605, 87 A.2d 805, 807; Harmonie Club, Inc. v. Smirnow, 1927, 106 Conn. 243, 247, 137 A. 769, 770; Van Epps v. Redfield, 1897, 69 Conn. 104, 36 A. 1011. However, this part performance exception is applicable only to sales of interests in real estate. Burkle v. Superflow Mfg. Co., supra, 137 Conn. 488, 78 A.2d 698, 703.

Affirmed.

HAND, Circuit Judge (concurring in part and dissenting in part).

My brothers have stated the facts so fully that I shall not add anything except

enough to make plain my reasoning. In the action against the corporation—Lee v. Jenkins Brothers (incorporated in New Jersey)—I need discuss only two questions: First, whether plaintiff's testimony, which constituted all the evidence in the record, was so inherently improbable that it would have been necessary to set aside a verdict in his favor; and second, whether, assuming that Yardley did make the contract on behalf of the corporation, he had authority to do so. The result in the action against Yardley personally—Lee v. Yardley—assuming that Yardley did make the personal contract as alleged, depends on whether it was valid under the Statute of Frauds. I shall first consider whether the plaintiff's testimony was inherently too unreliable to support a verdict that Yardley ever made the contract.

It seems to me that, great as may be my personal doubts as to the truth of the plaintiff's testimony, it was not so patently incredible that a jury should not have been allowed to accept it. The corporation was about to take over the plant of the Crane company with which Lee, who was then thirty years old, had been connected for the preceding thirteen years. He had become the "business manager" which was the "highest job in the plant outside the production superintendent"; and the corporation certainly wished to continue the business. The Crane company at the time, 1920, had a pension system under which employees who were discharged after the age of 60, or who voluntarily retired after 65, were entitled to a pension reckoned on two percent of their salary for each year they had worked, but limited to $1500 each year. The plaintiff's salary was $4,000 and in six years he would have reached the maximum, even though he was granted no increase meanwhile. The corporation installed a similar system shortly after the time when Lee swore that Yardley had made the personal promise to him; and the variant which

Yardley's promise to him introduced in both pension plans was that, whereas under them he got no pension whatever, if he voluntarily retired before 65 or was discharged before 60, under the separate contract he was to receive a pension beginning at 60, although he had not served the corporation until the specified date. It cannot therefore be disputed that the alleged contract did give him an extremely important advantage over the other employees by putting it within his power to leave the business at any time with an assurance that he would enjoy a pension when he reached sixty. At the time of the trial, not only was Yardley dead, but so were the two other persons who he said had been present at the interview, Mr. and Mrs. Barrington. Furthermore, he never raised the question again, so far as appears, during the 25 years that he continued to serve. On the other hand it is impossible to appraise what may have been the importance to the corporation of his adherence to the business, or what added inducement beyond the old pension plan it might have been thought wise to offer him, if it was necessary to secure him. At worst, the difference to the corporation would be that it accepted the risk that he might not stay with the business for the full period: after six years the amount of the pension would be the same whether he did or not. Little impressive as is his testimony, in the end the question is as to its credibility, and that is one of the standard issues that a jury must decide. Indeed, Judge Lumbard did not suggest that there was no issue of fact for the jury.

However, I cannot agree that Yardley, as president of the corporation, had authority to make a contract that was to last for the life of the promisee. I have not indeed found any decision in Connecticut that decides that question; but in New York, New Jersey, Maryland, Iowa, Wyoming and West Virginia the law is settled [1] and in Texas the same

---

1. Heaman v. E. N. Rowell Co., 1933, 261 N.Y. 229, 185 N.E. 83; Carney v. N. Y. Life Ins. Co., 1900, 162 N.Y. 453, 57 N.E. 78, 49 L.R.A. 471; Greaves v. American Institute for Scientific Research, 1921, 114 Misc. 413, 187 N.Y.S.

limitation was even imposed on the president's authority to make a contract for three years.[2] There is a fairly well established exception to this doctrine when the promise is part of the settlement of a claim for personal injuries,[3] and one case so decided when the promisee, though injured, had apparently made no claim.[4] The distinction is a little hard to justify rationally, except for the strength of the motive that personal injury adds; however, even assuming as I do that it exists, the case at bar is not within the exception. Since the Connecticut courts have indicated no disposition to the contrary, I assume that they would follow so generally accepted a doctrine. There being no relevant corporate by-law, I would say that the accepted doctrine is the law of Connecticut. If the law of New Jersey should be thought to measure the president's powers—which I do not suggest—the same result follows, a fortiori. For this reason I think that the complaint in the action against the corporation was rightly dismissed.

Coming next to the action of Lee v. Yardley and assuming that a contract was made, the first question is whether Yardley's promise was void under the Statute of Frauds as a promise to be answerable to "a debt, default or miscarriage of another." It is well settled law—although again I have found no Connecticut decisions—that this clause of the Statute presupposes some valid obligation running from a third party to the promisee; and does not include situations in which the parties to the contract mean to provide for the failure of the third party to enter into any legal obligation at all. Duca v. Lord, 1954, 331 Mass. 51, 117 N.E.2d 145; Delaware Feed Stores v. First Auburn Trust Co., 1956, 151 Me. 372, 120 A.2d 223; Walker v. Norton, 1857, 29 Vt. 226; Ledlow v. Becton, 1860, 36 Ala. 596; Mease v. Wagner, 1821, 1 McCord (S.C.) 395; Restatement of Contracts § 180, Comment (b), Illustrations 3 and 4; 2 Williston on Contracts § 454. The distinction between the promisee's failing to secure an obligation from the third person, and the third person's failing to perform an obligation has little to commend it as a new question, but I accept it as a valid gloss upon the clause. Although Lee steadfastly clung to the statement that Yardley had "guaranteed" the corporation's payment of the pension, that makes no difference, if the corporation was not liable; for in that event there was no "debt, default or miscarriage" to which Yardley's promise was secondary. Clearly Yardley did not mean to confine his promise to the possibility that the corporation, having entered into a valid contract, might fail to pay the pension.

Finally, it is true that the Connecticut Statute of Frauds, as usual, requires a contract to be in writing, if it cannot be performed within one year, and that according to Lee's testimony, his pension

---

420; Savarese v. Pyrene Mfg. Co., 1952, 9 N.J. 595, 89 A.2d 237; Pullman Co. v. Ray, 1953, 201 Md. 268, 94 A.2d 266; Chesapeake & Potomac Telephone Co. of Baltimore City v. Murray, 1951, 198 Md. 526, 84 A.2d 870; Lewis v. Minnesota Mut. Life Ins. Co., 1949, 240 Iowa 1249, 37 N.W.2d 316; Horvath v. Sheridan-Wyoming Coal Co., 1942, 58 Wyo. 211, 131 P.2d 315; Beall v. Morgantown & Kingwood R. Co., 1935, 116 W.Va. 515, 182 S.E. 295; See also General Paint Corp. v. Kramer, 10 Cir., 1932, 57 F. 2d 698. But see Baltimore & O. R. Co. v. Foar, 7 Cir., 1936, 84 F.2d 67, where a life contract by an agent without express authority was held enforceable, apparently on the ground that there had been a ratification.

2. Leak v. Halaby Galleries Inc., Tex.Civ. App.1932, 49 S.W.2d 858. But see Model Clothing House v. Hirsch, 1908, 42 Ind. App. 270, 85 N.E. 719.

3. E. g., F. S. Royster Guano Co. v. Hall, 4 Cir., 1934, 68 F.2d 533. But see Savarese v. Pyrene Mfg. Co., 1952, 9 N.J. 595, 89 A.2d 237; Horvath v. Sheridan-Wyoming Coal Co., 1942, 58 Wyo. 211, 131 P.2d 315; Pullman Co. v. Ray, 1953, 201 Md. 268, 94 A.2d 266; Beall v. Morgantown & Kingwood R. Co., 1935, 116 W.Va. 515, 182 S.E. 295.

4. Eggers v. Armour & Co. of Delaware, 8 Cir., 1942, 129 F.2d 729.

did not fall due until he had reached the age of 60. Nevertheless, he remained in the employ of the corporation for 25 years after the contract was made, when the corporation discharged him for some reason not disclosed. Connecticut courts in accord with the general interpretation of this provision of the statute have steadily ruled that, when the promisee of such a contract has performed in full, he may enforce the promise, although it was, and has remained, oral. Harmonie Club Inc. v. Smirnow, 106 Conn. 247, 137 A. 769; Blakeslee v. Board of Water Commissioners, 1937, 121 Conn. 163, 186, 183 A. 887; Burkle v. Superflow Manufacturing Co., 137 Conn. 488, 78 A.2d 698; Strang v. Witkowski, 138 Conn. 94, 82 A.2d 624. Therefore, the question arises whether Lee did not fully perform his contract by working for the corporation until 1945 when he was discharged. It is quite true that this exception is an entirely judicial invention, avowedly imposed in the interest of fair dealing; or, as it is sometimes put, in order to prevent the statute from being an instrument for the perpetration of fraud instead of for its prevention. Be that as it may, it has become as much a part of it as anything in it, and it seems to me undesirable to import into it refinements of nebulous outline. There still remains the question whether Lee fully performed, since he was discharged before he had served until he was 60, but if the exception is to realize its purpose, surely the promisor must not be allowed to escape by preventing the promisee from completing his performance.

In what I have said I do not mean to pass upon the question whether the plaintiff could alternatively recover for Yardley's breach of an implied warranty that he was authorized to make the contract for the corporation.

I think that the judgment dismissing the complaint in Lee v. Jenkins should be affirmed, but that the judgment in Lee v. Yardley should be reversed, and the action remanded for further proceedings not inconsistent with the foregoing opinion.